Slip Op. 00 - 84

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

_____

|  |  |  |
|---|---|---|
| | : | |
| AMERICAN SILICON TECHNOLOGIES, | : | |
| ELKEM METALS COMPANY and | : | |
| GLOBE METALLURGICAL INC. | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **PUBLIC VERSION** |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| LIGAS DE ALUMINIO S.A. | : | |
| | : | |
| Defendant-Intervenor. | : | |
| _____ | : | **Before: MUSGRAVE, JUDGE** |
| _____ | | |
| | : | Consolidated Court No. 99-03-00149 |
| ELETROSILEX S.A., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| AMERICAN SILICON TECHNOLOGIES, | : | |
| ELKEM METALS COMPANY and | : | |
| GLOBE METALLURGICAL INC. | : | |
| | : | |
| Defendant-Intervenors. | : | |
| _____ | : | |

[The Court sustains the Department of Commerce's determination in *Silicon Metal From Brazil: Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 6305 (Feb. 9, 1999), as to Ligas de Aluminio S.A. and remands it as to Eletrosilex S.A.]

Dated:  July 17, 2000

*Baker & Botts, L.L.P.* (*William D. Kramer*, *Martin Schafermeier*, *Clifford E. Stevens, Jr.*, *Matthew T. West* and *Lynn M. Schug*) for plaintiffs and defendant-intervenors American Silicon Technologies, Elkem Metals Company, and Globe Metallurgical Inc.

*Verner, Liipfert, Bernhard, McPherson & Hand* (*Wayne S. Bishop*) for plaintiff Eletrosilex, S.A.

*David W. Ogden*, Acting Assistant Attorney General, *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*Reginald T. Blades, Jr.*), and Office of Chief Counsel for Import Administration, U.S. Department of Commerce (*John F. Koeppen*), of counsel, for defendant.

*Dorsey & Whitney LLP* (*Philippe M. Bruno*, *Munford Page Hall*, *II*, and *Kevin B. Bedell*) for defendant-intervenor Ligas de Aluminio, S.A.

**OPINION AND ORDER**

This is a consolidated action brought pursuant to 28 U.S.C. § 1581(c). Plaintiffs American Silicon Technologies, Elkem Metals Co., and Globe Metallurgical Inc. (collectively "American Silicon"), domestic producers of silicon metal, were petitioners in the administrative proceeding. Plaintiff Eletrosilex S.A., a Brazilian producer of silicon metal, was a respondent in the administrative proceeding. Plaintiffs challenge different aspects of the final results of the sixth administrative review of the antidumping duty order on silicon metal from Brazil, *Silicon Metal From Brazil: Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 6305 (Feb. 9, 1999) ("*Final Results*"), issued by the International Trade Administration of the United States Department of Commerce ("Commerce" or "the agency").

Presently before the Court are separate motions for judgment on the agency record pursuant to CIT Rule 56.2 filed by plaintiffs American Silicon and Eletrosilex. American Silicon contests Commerce's decision to calculate a dumping margin for Ligas de Aluminio S.A. ("LIASA") based on a single United States

sale, which American Silicon alleges was not a *bona fide*, arm's-length transaction.  Eletrosilex challenges several aspects of Commerce's decision to use total adverse facts available in calculating its dumping margin

### *Standard of Review*

The Court shall uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law".  19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)).  This standard requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).  However, substantial evidence supporting an agency determination must be based on the whole record, and a reviewing court must take into account not only that which supports the agency's conclusion, but also "whatever in the record fairly detracts from its weight."  *Melex USA, Inc. v. United States*, 19 CIT 1130, 1132, 899 F. Supp. 632, 635 (1995) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 478, 488 (1951)).

### *I.  Motion of American Silicon*

LIASA was one of four Brazilian silicon metal producers involved in this review and reported only one U.S. sale made during the period of review, July 1, 1996, through June 30, 1997. In its preliminary results, pursuant to 19 U.S.C. § 1673, Commerce calculated a zero percent dumping margin for LIASA based on a comparison of the export price for this single U.S. sale and

its normal value. American Silicon submitted comments urging Commerce to disregard LIASA's sale on the ground that it was not a *bona fide*, arm's-length transaction. Commerce, however, concluded that "the information on the record does not support a finding that the sale was not a *bona fide* transaction" and calculated a final zero percent dumping margin for LIASA. *Final Results*, 64 Fed. Reg. at 6316.

American Silicon subsequently filed the present action, alleging that Commerce's decision to use the sale to calculate a margin for LIASA is not supported by substantial evidence on the record and is contrary to the agency's precedent.

### *Allegations*

American Silicon first challenges Commerce's finding that the transaction between LIASA and the U.S. buyer was made at arm's-length and negotiated based on their independent interests. *See* Brief in Support of Plaintiffs' Motion for Judgement Upon the Agency Record ("American Silicon's Brief") at 20-25. American Silicon argues that the parties had a common interest in eliminating LIASA's dumping duty deposit rate and timed the sale to permit LIASA to request a new shipper review.[1] *Id.* at 24-25.

---

[1] Pursuant to 19 U.S.C. § 1675(a)(2)(B)(i), an exporter or producer of merchandise subject to an antidumping duty order can request a new shipper review provided that

> (I) such exporter or producer did not export the merchandise that was the subject of an antidumping duty . . . order to the United States . . . during the period of investigation, and

> (II) such exporter or producer is not affiliated . . . with any exporter or producer who exported the subject merchandise to the United States . . . during that period . . . .

<span style="float:right">(continued...)</span>

Second, American Silicon contends that Commerce erred in finding that the purchase price and transportation costs were acceptable because the sale was a "testing/trial run" sale to an end-user of the material. *See id.* at 25-32. Specifically, American Silicon alleges that the sale was commercially unreasonable because the price paid by the U.S. purchaser was inconsistent with market prices at the time, and because the mode of shipment was more costly than the usual method for shipping silicon metal. *Id*. at 25-26. American Silicon also notes that Commerce's explanation that price might not be a primary concern in a "test sale" contradicts affidavits from several domestic silicon metal producers, which state that the unit price and method of shipping for a test sale would normally follow market prices and practices. *Id*. at 27-28. Moreover, American Silicon notes that Commerce's explanation of the sales price differs from LIASA's own explanation. *Id*. at 28-29.

Third, American Silicon argues that Commerce was incorrect in finding that the timing and the method of shipment do not indicate that the sale was non-*bona fide*. *See id*. at 32-35. American Silicon contends that there is no record evidence to support this finding since it was based on an

---

[1](...continued)

Furthermore, pursuant to 19 U.S.C. § 1675(a)(2)(B)(ii)

> [t]he administering authority shall commence a [new shipper] review
> . . . in the calendar month beginning after–
>
>> (I) the end of the 6-month period beginning on the
>> date of the . . . antidumping duty order under review,
>> or
>>
>> (II) the end of any 6-month period occurring
>> thereafter,
>
> if the request for the review is made during that 6-month period.

affidavit submitted by the U.S. buyer which was stricken from the administrative record because it was submitted untimely. *Id*. at 33. Furthermore, American Silicon notes that even if the affidavit had been admitted, it does not mention silicon metal as having been previously shipped in this manner or provide a reason why this method of shipping was necessary in this particular sale. *Id*. American Silicon also alleges that it was highly unusual for silicon metal to be shipped in this manner. *Id*. at 34. Moreover, American Silicon argues that the buyer could not have had an urgent need which required that the metal arrive in such a short time frame due to its operating schedule at the time of delivery. *Id*. American Silicon concludes that the only plausible explanation for the timing and method of transport was to qualify LIASA for a new shipper review. *Id*. at 35.

Fourth, American Silicon challenges Commerce's finding that the sale was commercially reasonable despite the fact that LIASA deviated from its normal business practice by proceeding with the shipment without first receiving a formal purchase order from its U.S. customer. *See id*. at 36-37. On this point, American Silicon argues, in essence, that it is unreasonable to accept both the claim that the buyer could not provide a purchase order due to its operating schedule at the time, and the claim that the buyer had an immediate need for the shipment of silicon metal. *Id*.

Fifth, American Silicon highlights certain facts on the record which it contends that Commerce failed to consider. Those facts are: (1) the parties' discussion of the dumping margin, (2) the buyer having entered into a supply contract with another silicon metal producer before it ordered the shipment from LIASA, (3) the buyer's operating schedule at the time of shipment, (4) the difference between the price of the sale and the price of LIASA's original bid, (5) affidavits stating that a test sale would normally be made at the market price, and (6) that, contrary to LIASA's claim, there was not a supply shortage of silicon metal at the time of the sale. *See id*. at 41-42.

Finally, American Silicon argues that Commerce's decision is inconsistent with the agency's precedent of excluding sales made under similar circumstances. *See id*. at 42-44. Specifically, in *Certain Cut-to-Length Carbon Steel Plate from Romania*, 63 Fed. Reg. 47,232 (Sept. 4, 1998), Commerce considered factors such as the method of shipment, the timing of the sale, and the quantity sold and excluded that sale based on its determination that the single U.S. sale at issue was artificially structured and commercially unreasonable. In the present case, American Silicon alleges that the facts are essentially the same, but Commerce reached the opposite conclusion. American Silicon's Brief at 43-44. Thus, American Silicon argues that Commerce's decision violates the legal principle that "agencies must follow their prior decisions in the absence of a reasoned basis to depart from those decisions." *Id*. at 42.

### *Discussion*

Under 19 U.S.C. § 1675(a)(2)(A), Commerce is required to determine "the normal value[2] and export price (or constructed export price)[3] of each entry of the subject merchandise". While the language of the statute appears to be all-inclusive, the Court has provided a limited exception which allows Commerce to "exclude sales from [United States Price[4]] in an administrative review

---

[2]  Normal value is the price at which subject merchandise is sold in the producer's home market or, under certain circumstances, its export price to a country other than the United States. *See* 19 U.S.C. §§ 1677b(a)(1)(B)-(C).

[3] Generally speaking, export price is the pricing methodology used when merchandise is sold by a foreign producer or exporter directly to an unrelated U.S. purchaser. *See* 19 U.S.C. § 1677a(a) (1994). When the sale is made indirectly, through a party related to the foreign producer or exporter, constructed export price is used. *See* 19 U.S.C. § 1677a(b).

[4] Pursuant to the Uruguay Round Agreements Act, Pub. L. No. 103-465, § 223, 108 Stat. 4809, 4876 (1994), the terms "export price" and "constructed export price" replaced the term "United States price". *Compare* 19 U.S.C. §§ 1677a(a)-(c) (1988) *with* 19 U.S.C. §§ 1677a(a)-(b) (1994).

in exceptional circumstances when those sales are unrepresentative and extremely distortive." *FAG*

*U.K. Ltd. v. United States*, 20 CIT 1277, 1281-82, 945 F. Supp. 260, 265 (1996). *See also Chang*

*Tieh Indus. Co. v. United States*, 17 CIT 1314, 1318-19, 840 F. Supp. 141, 145-46 (1993); *American*

*Permac, Inc. v. United States*, 16 CIT 41, 44, 783 F. Supp. 1421, 1424 (1992); *Ipsco v. United States*,

13 CIT 402, 408, 714 F. Supp. 1211, 1217 (1989), *rev'd on other grounds*, 965 F.2d 1056 (Fed. Cir.

1992). In prior cases Commerce has considered, *inter alia*, factors such as timing, sale price,

transportation costs, other expenses borne by the importer, and whether the merchandise was resold

by the importer at a loss to determine whether a sale was a *bona fide*, arm's-length transaction. *See,*

*e.g., Carbon Steel Plate from Romania*, *supra*, (excluding a sale from an administrative review

because these factors indicated that the sale was not *bona fide*). In the present case, Commerce

followed its prior practice and examined essentially the same factors.

Concerning the price and terms of the sale between LIASA and the U.S. buyer, Commerce

reasoned:

> While it is consistent with good business practices to purchase acceptable material at favorable prices, a purchaser's failure to obtain prices that may be favorable does not necessarily mean the transaction is not at arm's-length. Arm's-length transactions are those transactions whose terms are negotiated based on the independent interests of the parties involved. Those interests may vary depending on the parties and the nature of the sale. While obtaining a commercially reasonable price for a purchase may be of critical concern to a party who intends to resell the items purchased, price may not be as critical to an original equipment manufacturer (OEM) or an end-user which is seeking to evaluate the quality of the product. Other considerations, such as establishing supplier relationships and alternative supplier sources, may affect the price an end-user is willing to pay. In such situations, the price of the transaction may not be the primary concern because only a limited quantity is purchased for testing purposes.

*Final Results*, 64 Fed. Reg. at 6317. Review of the administrative record shows that this explanation

is based largely on statements made by LIASA during verification when asked why the U.S.

purchaser would have ordered such a [        ] quantity of silicon metal and paid a [

         ] price. *See Commerce Memorandum: Verification of LIASA* (July 30, 1998),

Confidential Record Document ("Conf. Doc.") 75, at 7. LIASA also stated that a [        ] sale

to a new customer is normal, and it believed "that the quantity sold was for a test run based on its

past experience as LIASA recently made [a sale of a similar amount] to a customer in Europe for the

same purpose." *Id.* at 6-7. It is also apparent that Commerce is distinguishing this case from *Carbon

Steel Plate from Romania*, where its conclusion that the sale was commercially unreasonable was

based in part on the fact that the U.S. customer, which was not an end-user, resold the merchandise

at a loss. *See Carbon Steel Plate from Romania*, 63 Fed. Reg. at 47,234. Although LIASA's

explanation is contradicted by affidavits submitted by several domestic silicon metal producers, such

evidence alone does not show that the explanation accepted by Commerce is not "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *See Matsushita

Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). As it is not the Court's

province to re-weigh evidence already considered by Commerce, *see Consolo v. Federal Maritime

Comm'n*, 383 U.S. 607, 620 (1966), the Court finds no reason to disturb the agency determination

on this issue.[5]

_____

     [5] The Court notes that LIASA's explanation that the sale price was [     ] than its original
bid price because the market was "unusually tight" at the time of the sale, *Commerce Memorandum:
Verification of LIASA* (July 30, 1998), Conf. Doc. 75, at 6-7, is apparently contradicted by other
evidence on the record indicating that the market was softening, American Silicon's Brief at 28
(citing Plaintiff's August 10 Rebuttal Factual Submission at Exhibit 1, Conf. Doc. 83 and Plaintiff's
August 17 Rebuttal Factual Submission at Exhibit 2, Conf. Doc. 84). However, since Commerce
determined that a commercially competitive price was not necessarily a primary concern in a test sale
and discounted its importance in evaluating whether the transaction at issue was *bona fide*, this
discrepancy does not prove that Commerce's decision is unsupported by substantial evidence.

Commerce also found that the timing of the shipment did not indicate that the sale was not *bona fide.*

> Although the importer in the instant review did incur high costs for air freight . . . there is no indication that the merchandise was shipped by air freight solely to ensure that it entered the United States before the end of the POR. In fact the purchaser has stated on the record that based on its time requirements it may transport various inputs using air freight, and we note that the merchandise entered the United States fully six months prior to the end of the POR. The petitioner's argument that the merchandise was air freighted to the United States in order for the party to be able to request a new-shipper review is not indicative of a non-bona fide sale since no such review has been requested by the exporter of the subject matter.

*Final Results*, 64 Fed. Reg. at 6317. The Court finds that Commerce did rely upon the buyer's affidavit concerning its shipping practices, which had been stricken from the agency record. However, the mere fact that the buyer requested an unusual mode of shipment does not make this request unreasonable. Unlike *Carbon Steel Plate from Romania*, where the parties admitted that air shipment was necessary in order to make an entry within the period of review, *see* 63 Fed. Reg. at 47,233, in the present case there is no clear record evidence that the method of shipment was selected for any reason relating to the administrative review. Moreover, in this case there is no evidence that LIASA played a role in setting the delivery terms, and LIASA asserts that it merely accepted the terms requested by the buyer. *See Commerce Memorandum: Verification of LIASA* (July 30, 1998), Conf. Doc. 75, at 8. Although the method of shipment may be unusual for the silicon metal industry, there is no evidence that there was an improper purpose behind this aspect of the sale.

Commerce also found that "the fact that the buyer did not issue a purchase order until after LIASA had shipped the subject merchandise is not such a significant deviation from typical commercial practice as to call into question, *inter alia*, the commercial reasonableness of the transaction." *Final Results*, 64 Fed. Reg. at 6317. Commerce stated that this was especially true "in

light of the U.S. customer's operating schedule between the time the purchase order was generated and issued." *Id.* American Silicon's only argument against Commerce's rationale is that "[i]t does not explain why it was necessary for [the purchaser] to take the extraordinary step of purchasing a [                ] of silicon metal from LIASA at a time when it was unable to follow its normal purchasing procedures (and its supplier's normal sales procedures)." American Silicon's Brief at 37. In the absence of other evidence, there is nothing about this deviation from LIASA's normal business practice which suggests that the sale was not *bona fide*.

Finally, none of the facts which American Silicon alleges that Commerce failed to consider undermine the reasonableness of Commerce's determination. First, there was nothing unlawful or improper in the parties' discussions of the dumping margin and the potential applicability of legal exemptions. Second, the fact that the buyer had entered into an exclusive supply contract with another silicon metal producer before it ordered the test shipment from LIASA appears to support Commerce's conclusion as much as it may detract from it. As LIASA argued in its defendant-intervenor brief, since the delivery date of its shipment was just before the contract with the other supplier was to take effect, the buyer may have timed delivery to avoid a possible conflict with its other supplier. LIASA's Response in Opposition to Plaintiff's Motion for Judgment on the Agency Record at 11-12. Aside from this, if one accepts that the buyer was only purchasing this [       ] amount of silicon from LIASA to test its quality, it is largely irrelevant that it had already arranged for another producer to supply its needs for the near future. Third, the difference between the price LIASA charged for the test sale [              ] and the price it stated in its bid to supply all of the buyer's silicon metal needs for the coming year [               ] is insignificant since, as previously discussed, Commerce accepted testimony that price is not necessarily a primary consideration in the

context of a test sale. The Court also notes that although the price difference is high when stated as

a percentage, it is actually only [          ]. Moreover, the cost of this sale, including shipping, was

only [          ]. It may be unreasonable for a manufacturer to pay this unit price when contracting

for a year's supply, but for a single [          ] sale this is a minor cost for a large buyer such as the

one involved here.

With regard to American Silicon's argument that Commerce's decision is inconsistent with

the agency's precedent of excluding sales made under similar circumstances as in *Carbon Steel Plate*

*from Romania*, the Court finds that Commerce adequately distinguished the instant case from its

previous decisions. In *Carbon Steel Plate from Romania*, Commerce found that the sale was not

*bona fide* based on a number of factors, only a few of which are present in this transaction, namely

the timing of the sale, the high cost of shipment, and the quantity sold. In the *Final Results*,

Commerce has distinguished these cases based on the fact that in *Carbon Steel Plate from Romania*

it was admitted that the merchandise was shipped by air freight to ensure that it entered the United

States within the period of review. In the instant case, Commerce observed that the shipment arrived

a number of months prior to the end of the review period, and although it arrived just in time to

qualify LIASA for a new shipper review, LIASA never requested this review, nor is there any

evidence that it contemplated doing so. Moreover, as previously noted, there is no evidence

contradicting LIASA's claim that the U.S. buyer requested the mode of shipment and LIASA merely

complied with its request. Also, as discussed above, the quantity purchased was consistent with this

being a test sale. Commerce has also distinguished these cases based on the fact that LIASA's U.S.

customer was an end-user of the silicon metal and did not resell the merchandise at a loss, which was

a primary factor leading to Commerce's conclusion that the sale in *Carbon Steel Plate from Romania*

was not *bona fide*. As the two administrative review determinations have been adequately distinguished, Commerce's conclusion is not inconsistent with the agency's precedent and is thereby in accord with principles of administrative law. *See Citrosuco Paulista, S.A. v. U.S.*, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088 (1988) ("[A]n agency must either conform itself to its prior decisions or explain the reasons for its departure.") *quoted in Queen's Flowers de Columbia v. United States,* 21 CIT 968, 976, 981 F. Supp. 617, 625 (1997).

Thus, for the foregoing reasons and as previously announced at the conclusion of oral argument in this action, American Silicon's motion is denied and the *Final Results* are sustained as to LIASA.

## II.  Motion of Eletrosilex

Eletrosilex was another Brazilian silicon metal producer involved in the sixth administrative review. On September 22, 1997, Commerce sent Eletrosilex an initial antidumping questionnaire, and after analyzing Eletrosilex's responses, Commerce issued a supplemental questionnaire on March 24, 1998. Eletrosilex responded promptly, but after analyzing this information, Commerce concluded that additional information was still needed on certain topics. A second supplemental questionnaire was issued on June 29, 1998, and a third was issued on July 6, 1998. Both supplemental questionnaires required responses within one week due to Commerce's statutory deadline of July 30, 1998, for filing its preliminary results. Eletrosilex did not submit responses to either request. On July 7, 1998, counsel of record for Eletrosilex informed Commerce that Eletrosilex was in the process of being acquired. Subsequently, on July 20, 1998, counsel informed Commerce that because of management reviews and changes in staffing Eletrosilex was not able to respond in a timely manner to the June 29 and July 6 questionnaires.

In the preliminary results, Commerce concluded, pursuant to section 782(e) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677m(e), that "while Eletrosilex data is incomplete for certain elements of the calculation, nevertheless the Department has enough data on the record to reasonably calculate a dumping margin." *Silicon Metal from Brazil: Preliminary Results of Antidumping Duty Administrative Review*, 63 Fed. Reg. 42,001, 42,007 (Aug. 6, 1998). In order to make this calculation, Commerce relied on partial facts available[6], and used an adverse inference[7] in applying those facts. *Id.* Commerce determined that the adverse inference was appropriate because:

> In the past, Eletrosilex has demonstrated an understanding for requests of additional information by the Department. In this review Eletrosilex responded on April 10, 1998, to the Department's March 24, 1998 supplemental questionnaire. However, its failure to provide responses to our other supplemental questionnaires (i.e. dated June 29 and July 6, 1998) despite numerous opportunities to do so constitutes a failure to cooperate to the best of its ability with respect to our requests for information.

*Id.* (citation omitted). Thus, using adverse partial facts available, Commerce calculated a dumping margin of 33.11 percent for Eletrosilex. *Id.* at 42008.

---

[6] Generally, Commerce uses partial facts available only to fill "gaps in the record due to deficient submissions or other causes." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-826, at 656, 869 (1994) ("SAA"). Pursuant to 19 U.S.C. § 1677m(d)-(e), when a party's response to a request for information is deficient and certain requirements, discussed *infra* p. 21-22, are not met Commerce may disregard the information that was submitted and use total, as opposed to partial, facts available.

[7] An adverse inference is applied when a party has not acted to the best of its ability to comply with requests for information. *See* 19 U.S.C. § 1677e(b). The adverse inference is intended to "ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." SAA at 870. In applying an adverse inference, Commerce may rely on information from "(1) the petition, (2) a final determination in the investigation under this subtitle, (3) any previous review under section 1675 of this title or determination under section 1675b of this title, or (4) any other information placed on the record." *See* 19 U.S.C. § 1677e(b). If an adverse inference is not warranted, "the facts available are information or inferences which are reasonable to use under the circumstances." SAA at 869.

Commerce then issued its *Final Results* in which it "determined that Eletrosilex's questionnaire responses on the record are insufficient for purposes of conducting a margin analysis." *Silicon Metal from Brazil: Notice of Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 6305, 6310 (Feb. 9, 1999). After repeating its preliminary conclusion that Eletrosilex had failed to cooperate to the best of its ability, Commerce concluded that total adverse facts available should be used as the basis for Eletrosilex's dumping margin and imposed "the highest rate calculated for any respondent in any segment of this proceeding," 93.20 percent. *Id*. at 6311.

Eletrosilex subsequently filed the present action alleging on several grounds that Commerce's determination is contrary to law and not supported by substantial evidence on the record. Brief of Plaintiff Eletrosilex S.A. in Support of Motion for Judgment Upon the Agency Record ("Eletrosilex's Brief") at 8.

### *Allegations*

First, Eletrosilex alleges that Commerce violated this Court's holdings in *Borden Inc. v. United States*, 22 CIT__, 4 F. Supp. 2d 1221 (1998), *opinion after remand*, 22 CIT__, Slip. Op. 98-167 (Dec. 16, 1998), *aff'd sub nom. F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, __ F.3d __, No. 99-1318 (Fed. Cir. June 16, 2000), and *Ferro Union, Inc. v. United States*, 23 CIT__, 44 F. Supp. 2d 1310 (1999), *opinion after remand*, 23 CIT__, 74 F. Supp. 2d 1289 (1999), which require it to "make and articulate a finding that the party willingly or deliberately chose not to supply the requested information when it was able to do so" before using adverse facts available. Eletrosilex's Brief at 7. Eletrosilex alleges that Commerce "articulated no reason for believing that Eletrosilex was able to comply but willfully chose not to do so", but "merely recited the statutory standard that Eletrosilex 'did not act to the best of its ability'". *Id*. at 12.

Second, Eletrosilex contends that Commerce erred in finding that the record was so incomplete that it could not be used to calculate a margin. Eletrosilex asserts that none of the factors cited by Commerce as the basis for this conclusion are persuasive.

> Commerce's lead factor was that Eletrosilex's "failure to provide certain sales documentation" rendered Commerce unable to determine whether Eletrosilex's sales should be calculated as EP (Export Price) or CEP (Constructed Export Price) sales. In fact, however, Eletrosilex had provided to Commerce all of its sales documentation in its responses to the [initial] Questionnaire and [first] Supplemental Questionnaire. Moreover, Eletrosilex's U.S. sales in this review were made entirely consistent with its sales in other administrative reviews in which Commerce determined that they were EP sales.

> Commerce's second factor was the failure of Eletrosilex to provide a 1997 financial statement, which assertedly prevented Commerce from ascertaining whether "reported depreciation expenses" were tied to its fixed assets as reported in the 1996 and 1997 financial statements. But, Commerce noted that it did have Eletrosilex's submission of its 1996 financial statement, which permitted Commerce to make the assessment for the first six months of the period of review. That is sufficient data to assure that there is a consistency between the reported costs and public documents where the period of review, as here, consists of six-month periods in consecutive calendar years.

> The other factors specified by Commerce relate only to refinements to the data which Eletrosilex had submitted in detail earlier in the investigation. The information was voluminous in comparison to the refinements sought by Commerce, and was sufficiently complete that Commerce was able to make a margin calculation in the Preliminary Results through the use of partial facts available.

*Id.* at 18-19 (citations omitted) (footnotes omitted).

Finally, Eletrosilex asserts that Commerce failed to demonstrate that the facts available margin it applied to Eletrosilex is reliable and relevant. *See id*. at 14-15 (citing *Ferro Union, supra,* 44 F. Supp. 2d at 1334-35 (1999)). Eletrosilex contends that the only justification Commerce provided for the surrogate margin was that it was "sufficiently adverse to induce Eletrosilex's full cooperation in future reviews." *Id*. at 15 (quoting *Final Results*, 64 Fed. Reg. at 6307). Eletrosilex also alleges that there is evidence on the record indicating that the surrogate margin is not reliable

or relevant. Specifically, Eletrosilex notes that it was calculated based on sales that occurred in 1990; the respondent for whom the rate was originally calculated had not sold its product in the United States during the five years prior to this review; and the margin is inconsistent with margin calculations for Brazilian silicon metal producers, including Eletrosilex, in recent reviews. *Id*. at 15-16.

### *Discussion*

The Court first considers whether Commerce made the necessary findings required by statute and the Court's prior opinions before using adverse facts available to determine a dumping margin for Eletrosilex. Pursuant to 19 U.S.C. § 1677e(a), Commerce may use facts available to determine a dumping margin if it finds that

(1) necessary information is not available on the record, or

(2) an interested party or any other person–

> (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,

> (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

> (C) significantly impedes a proceeding under this subtitle, or

> (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,

Once Commerce determines that the use of facts available is appropriate under 19 U.S.C. § 1677e(a), it may, pursuant to 19 U.S.C. § 1677e(b), use an adverse inference when applying facts available if

it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information".

The Court has examined the requirements of 19 U.S.C. § 1677e(b) in several recent decisions. In *Borden Inc. v. United States*, *supra*, 4 F. Supp. 2d 1221 (1998), Commerce applied total adverse facts available to F.lli De Cecco di Filippo Fara San Martino S.p.A. ("De Cecco") based on its "failure to provide complete and accurate information in a timely manner and its failure to clarify inconsistencies in its submissions to the record". *Id.* at 1246 (quoting *Certain Pasta from Italy*, 61 Fed. Reg. 30,326, 30,329 (June 14, 1996)). The Court held that Commerce, in attempting to justify its use of adverse facts available, "simply repeated its 19 U.S.C. § 1677e(a)(2)(B) finding, using slightly different words" and "did not make the required *additional* finding that De Cecco had failed to act to the best of its ability." *Id.* (emphasis in original). Moreover, the Court observed that "Commerce has articulated no reason for finding De Cecco's failure was an unwillingness, rather than simply an inability, to cooperate". *Id*. at 1247.

Similarly, in *Ferro Union, Inc. v. United States*, *supra*, 44 F. Supp. 2d 1310 (1999), Commerce applied total adverse facts available to respondent Saha Thai after finding that it "significantly impeded the review" by failing to identify various affiliated companies. *Id*. at 1330 (quoting *Certain Welded Carbon Steel Pipes and Tubes from Thailand*, 62 Fed. Reg. 53,808, 53,809 (Oct. 16, 1997)). Here again, the Court found that Commerce had merely "repeated its 19 U.S.C. § 1677e(a)(2)(C) finding to determine that Saha Thai's responses evince an inability to comply to the best of its ability, pursuant to 19 U.S.C. § 1677e(b)." *Id.* at 1329. Thus, the Court held that "Commerce is obliged to explain why it concluded that a party failed to comply to the best of its ability prior to applying adverse facts, and it did not do so here." *Id*. at 1331.

Most recently, in *Mannesmannrohren-Werke AG v. United States*, __CIT__, 77 F. Supp. 2d 1302 (1999), Commerce applied adverse facts available after finding that the respondent failed to respond to part of one questionnaire and provided inaccurate information in another response. *Id.* at 1315. Once again, the Court noted that "failure to respond is only a basis for using 'facts available'" and concluded that "without an additional finding that this failure to respond was because Mannesmann 'failed to cooperate by not acting to the best of its ability' . . . 19 U.S.C. § 1677e(b) prohibits Commerce from applying an adverse inference." *Id.* (citations omitted).

In the instant case, Commerce based its decision to apply adverse facts available to Eletrosilex on the grounds that

> Eletrosilex responded only partially to one supplemental questionnaire and failed to respond altogether to two additional supplemental requests for information, which prevented the Department from making critical decisions involving the calculation of Eletrosilex's dumping margin. Accordingly, Eletrosilex did not comply with the request for information and thus, under section 776(b) of the Act, an adverse inference is warranted.

*Final Results*, 64 Fed. Reg. at 6306. Commerce also referenced a later section of the *Final Results* and an intra-agency memo regarding the application of facts available to Eletrosilex. *See id.* The reasoning in these sections is essentially the same, although Commerce additionally notes that Eletrosilex has a past history of complying with requests for information, and had "numerous opportunities" to respond in this instance. *Id.* at 6310. *See also Commerce Memorandum: Application of Facts Available for Eletrosilex* (Feb. 2, 1999) ("*February 1999 Facts Available Memo*"), Conf. Doc. 95, at 5.

Commerce cited the company's past history of compliance and repeated failure to respond in support of its application of adverse facts available presumably because it shows that Eletrosilex

was familiar with the procedure in dumping reviews and understood what it was required to do. However, it does not follow that simply because Eletrosilex was able to respond to prior questionnaires it was also able to respond to the June 29 and July 6, 1998, questionnaires at issue here. Moreover, when viewed in light of Eletrosilex's notification to Commerce that "it is undergoing top to bottom management reviews, and because of changes in staffing, it is *not able* to respond in a timely manner" Eletrosilex's history of compliance actually supports its claim that it was unable to respond in this instance. *Commerce Memorandum: Eletrosilex's Supplemental Questionnaire Responses* (July 20, 1998), Conf. Doc. 67 (emphasis added). *See also Commerce Memorandum: Eletrosilex's Supplemental Questionnaires* (July 7, 1998), Conf. Doc. 60.[8]

The Court recognizes that Commerce has also cited Eletrosilex's "numerous opportunities" to respond as additional support for its decision to apply adverse facts available. *See Final Results*, 64 Fed. Reg. at 6310. However, this too is not probative of Eletrosilex's *ability* to respond.

---

[8] Commerce did not give adequate consideration to Eletrosilex's claim that management and staffing changes rendered it unable to respond. While Eletrosilex's claimed inability is acknowledged on page two of the *February 1999 Facts Available Memo*, Conf. Doc. 95, the only place in the administrative record where Commerce considered the merit of this claim is on page two of the July 30, 1998, *Commerce Memorandum: Application of Facts Available Due to Failure of Eletrosilex to Respond to Two Departmental Supplemental Questionnaires*, Conf. Doc. 68, where Commerce merely concluded that "Eletrosilex's assertion . . . is not a sufficient justification for not supplying the information" without providing any factual or reasoned basis for this conclusion.

Additionally, Commerce and defendant-intervenors American Silicon, argue, *post hoc*, that Eletrosilex made a business decision not to respond to the supplemental questionnaires and did not act to the best of its ability. *See* Defendant's Memorandum in Opposition to Plaintiffs' Motions for Judgment Upon the Agency Record ("Commerce's Brief") at 9-10; Defendant-intervenors' Brief in Opposition to Plaintiff Eletrosilex's Motion for Judgement on the Agency Record at 11. However, the Court "must evaluate the validity of an agency decision on the basis of the reasoning presented in the decision itself" and shall not permit "'post hoc rationalizations' of counsel [to] supplement or supplant the rationale or reasoning of the agency." *Hoogovens Staal BV v. United States*, 24 CIT__, 86 F. Supp. 2d 1317, 1331 (2000) (quoting *FPC v. Texaco, Inc.*, 417 U.S. 380, 397 (1974)).

Furthermore, it is not clear that the "numerous opportunities" were meaningful opportunities to respond given the fact that the questionnaires required responses within a week and the review ended on July 30, 1998.

Commerce has not made the necessary finding that Eletrosilex failed to respond *to the best of its ability*. After reviewing Commerce's reasoning, the Court concludes that the primary basis for its determination was the mere fact that Eletrosilex failed to respond to the two supplemental questionnaires. As previously noted in *Borden* and *Mannesmannrohren-Werke*, *supra*, this is only a recitation of the standard for the application of facts available under 19 U.S.C. § 1677e(a)(2)(B) and is inadequate justification for making an adverse inference pursuant to 19 U.S.C. § 1677e(b). Accordingly, the Court remands this issue for reconsideration and instructs Commerce to reopen the administrative record and collect additional evidence concerning Eletrosilex's claimed inability to respond to the supplemental questionnaires.

Next, the Court considers whether it was appropriate for Commerce to resort to total, as opposed to partial, facts available in determining a dumping margin for Eletrosilex. Pursuant to 19 U.S.C. § 1677m(e), Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements" provided that

> (1) the information is submitted by the deadline established for its submission,
>
> (2) the information can be verified,
>
> (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
>
> (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements

> established by the administering authority or the Commission with respect to the information, and
>
> (5) the information can be used without undue difficulties.

*Id*. In the *Final Results*, Commerce determined that Eletrosilex failed to satisfy the third, fourth and fifth requirements and as a result concluded that a reliable margin could not be calculated based on the submitted information. *See* 64 Fed. Reg. at 6310. As previously stated, the Court is remanding the question of whether Eletrosilex acted to the best of its ability. Since this question also bears on the issue of whether it was appropriate for Commerce to resort to total facts available, the Court remands this issue for reconsideration as well.

Finally, the Court considers whether Commerce erred in its selection of a surrogate dumping margin to apply to Eletrosilex. Pursuant to 19 U.S.C. § 1677e(c), Commerce must, "to the extent practicable, corroborate [secondary] information from independent sources that are reasonably at [its] disposal."[9] Recently, the Federal Circuit Court of Appeals stated

> It is clear from Congress's imposition of the corroboration requirement in 19 U.S.C. § 1677e(c) that it intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance. Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin.

*F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, __ F.3d __, No. 99-1318, slip op. at 9-10 (Fed. Cir. June 16, 2000).

Previously, in *Ferro Union, Inc. v. United States*, *supra* , 44 F. Supp. 2d 1310 (1999), the court held that "[i]n order to comply with the statute and the SAA's statement that corroborated

---

[9] This statute was amended to include the corroboration requirement pursuant to the Uruguay Round Agreements Act, Pub. L. No. 103-465, § 231(c), 108 Stat. 4809, 4896-97 (1994).

information is probative information, Commerce must assure itself that the margin it applies is relevant, and not outdated, or lacking a rational relationship to [the respondent]." *Id*. at 1335. In that case, Commerce applied a surrogate margin that was calculated for another producer eight years prior to the period of review at issue. *See id*. This was done in spite of the fact that Commerce had other margins at its disposal which had been calculated for the respondent in prior administrative reviews. *See id*. The court found that "Commerce did not elaborate on why the 1987-88 Thai Union margin was more probative than other Saha Thai margins, other than the fact that the Thai Union margin was higher." *Id*. Accordingly, the court remanded the action to Commerce, *inter alia*, "to corroborate the dumping margin by showing the relevance of a particular margin and why it may be reliably applied to Saha Thai." *Id*. at 1336.

In the instant case, Commerce has followed the same practice that the court rejected in *Ferro Union*. Once again, Commerce has merely assumed that a prior calculated margin was relevant and reliable. Although Commerce stated that it "will consider information reasonably at its disposal as to whether there are circumstances that would render a margin irrelevant" and "[w]here circumstances indicate that the selected margin is not appropriate as adverse [facts available], the Department will disregard the margin and determine an appropriate margin," there is no evidence that it performed such an analysis. *Final Results* 64 Fed. Reg. at 6307, 6309-11. The only reason Commerce gave for selecting the 93.20 percent surrogate margin was "because we find that this rate is sufficiently adverse to induce Eletrosilex's full cooperation in future reviews." *Final Results*, 64

Fed. Reg. at 6307. Therefore, if on remand Commerce determines that it must use total facts available, it is instructed to explain the reliability and relevancy of the margin it selects.[10]

### *Conclusion*

For the foregoing reasons, the *Final Results* are sustained as to LIASA and remanded as to Eletrosilex for reconsideration and further proceedings consistent with this Opinion. Commerce shall have 90 days to submit its remand determination. The parties shall then have 30 days to submit comments on the remand determination. Any rebuttal comments shall be submitted within 15 days thereafter.

**SO ORDERED.**

---

[10] In its brief, Commerce attempts, *post hoc*, to demonstrate the relevance and reliability of the surrogate margin. *See* Commerce's Brief at 13. However, the Court evaluates Commerce's decision based only on the reasoning presented in the decision itself. *See Hoogovens Staal BV v. United States*, 24 CIT__, 86 F. Supp. 2d 1317, 1331 (2000). Moreover, the Court is not persuaded by Commerce's argument that the 93.20 margin is relevant because best information available ("BIA") margins over 90 percent were assigned to respondents for periods of review prior to January 1, 1995, the effective date of the Uruguay Round Agreements Act ("URAA"), which imposed the corroboration requirement. *See* Commerce's Brief at 13 (noting prior instances where Commerce imposed a margin over 90 percent); *Ferro Union, supra*, at 1333 (explaining the corroboration requirement of URAA). Such reasoning, if accepted, would permit Commerce to avoid the corroboration requirement of the URAA by imposing facts available margins consistent with the BIA margins used in reviews prior to 1995, when the corroboration requirement first went into effect. Because Commerce's argument that the surrogate margin bears a rational relationship to Eletrosilex is based on the same reasoning, the Court considers it equally unpersuasive.

_____
R. KENTON MUSGRAVE, JUDGE


Dated: July 17, 2000
        New York, New York