**Slip Op. 02-16**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                       :
WINDMILL INTERNATIONAL PTE., LTD.,     :
                                       :
              Plaintiff,               :
                                       :
        v.                             :   Court No.
                                       :   98-10-02975
UNITED STATES,                         :
                                       :
              Defendant,               :
                                       :
              and                      :
                                       :
BETHLEHEM STEEL CORPORATION and        :
U.S. STEEL GROUP, A UNIT OF            :
USX CORPORATION,                       :
                                       :
              Defendant-Intervenors.   :
_____:



        Plaintiff, Windmill International Pte., Ltd. ("Windmill"),
moves pursuant to USCIT R. 56.2 for judgment upon the agency record
challenging the Department of Commerce, International Trade
Administration's ("Commerce") rescission of the antidumping duty
administrative review entitled Certain Cut-to-Length Carbon Steel
Plate From Romania: Notice of Rescission of Antidumping Duty
Administrative Review ("Rescission Notice"), 63 Fed. Reg. 47,232
(Sept. 4, 1998).  Specifically, Windmill contends that Commerce
unlawfully rescinded the administrative review at issue after
Commerce determined that there was no bona fide sale.

        **Held**:  Windmill's 56.2 motion is denied.

[Windmill's 56.2 motion is denied.]


                              Dated:    February 21, 2002

Windmill International Pte., Ltd. (Edward Young) for Windmill.

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director, Kenneth J. Guido, Special Attorney, Richard P. Schroeder and Michele D. Lynch); of counsel: Barbara Campbell Potter, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States.

Dewey Ballantine LLP, (Michael H. Stein, Bradford L. Ward and Mel M. Negussie) for Defendant-Intervenors.

## OPINION

**TSOUCALAS, Senior Judge**: Plaintiff, Windmill International Pte., Ltd. ("Windmill"), moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") rescission of the antidumping duty administrative review entitled Certain Cut-to-Length Carbon Steel Plate From Romania: Notice of Rescission of Antidumping Duty Administrative Review ("Rescission Notice"), 63 Fed. Reg. 47,232 (Sept. 4, 1998). Specifically, Windmill contends that Commerce unlawfully rescinded the administrative review at issue after Commerce determined that there was no bona fide sale.

## BACKGROUND

This case concerns the antidumping duty order on cut-to-length carbon steel plate ("CSP") imported into the United States from

Romania during the period of review ("POR") covering August 1, 1996, through July 31, 1997.  Commerce initiated the subject review on September 25, 1997.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 62 Fed. Reg. 50,292 (Sept. 25, 1997).[1]  On September 4, 1998, Commerce published the Rescission Notice.  See 63 Fed. Reg. at 47,232.  Windmill initiated the case at bar against Commerce on November 3, 1998, and on December 9, 1998, this Court granted the consent motion of Bethlehem Steel Corporation and U.S. Steel Group, a Unit of USX Corporation ("Domestic Producers") to enter as defendant-intervenors.

### JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

### STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in an antidumping administrative review, the Court will uphold

---

[1] Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995).  See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).


## I.   Substantial Evidence Test

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).  Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'"  American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, Universal Camera, 340 U.S. at 488)).

## II.  <u>Chevron</u> Two-Step Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u> ("<u>Chevron</u>"), 467 U.S. 837 (1984).  Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue."  <u>Id.</u> at 842.  "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'"  <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing <u>Chevron</u>, 467 U.S. at 843 n.9).  "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter."  <u>Id.</u> (citations omitted).  Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history."  <u>Id.</u> (citations omitted); <u>but see</u> <u>Floral Trade Council v. United States</u>, 23 CIT 20, 22 n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however") (citation omitted).

If, after employing the first prong of <u>Chevron</u>, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. <u>See</u> <u>Chevron</u>, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. <u>See</u> <u>Fujitsu Gen. Ltd. v. United States</u>, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. <u>See</u> <u>Koyo Seiko Co. v. United States</u>, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); <u>see also</u> <u>IPSCO, Inc. v. United States</u>, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." <u>Negev Phosphates, Ltd. v. United States</u>, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole. <u>See</u> <u>Mitsubishi Heavy Indus. v. United States</u>, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).

## DISCUSSION

### I.   Commerce's Determination That Windmill's Sale Was Not Bona Fide

#### A.   Background

An antidumping duty is imposed upon imported merchandise when: (1) Commerce determines such merchandise is being dumped, that is, sold or likely to be sold in the United States at less than fair market value; and (2) the International Trade Commission determines that an industry in the United States is materially injured or threatened with material injury as a result of such dumping. See 19 U.S.C. §§ 1673, 1677(34) (1994). In determining antidumping duties, Commerce is required to determine "the normal value[2] and export price[3] . . . of each entry of the subject merchandise." 19 U.S.C. § 1675(a)(2)(A) (1994).[4] "While the language of [section 1675(a)(2)(A)] appears to be all-inclusive, the Court has provided

_____

[2] Normal value ("NV") of the subject merchandise is defined as "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(B)(i) (1994).

[3] Export price ("EP") means the "price at which the subject merchandise is first sold . . . by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser . . . ." 19 U.S.C. § 1677a(a) (1994).

[4] To determine whether there is dumping, Commerce compares the price of the imported merchandise in the United States (that is, EP) to the NV for the same or similar merchandise in the home market. See 19 U.S.C. § 1677b (1994).

a limited exception which allows Commerce to 'exclude sales from United States Price in an administrative review in exceptional circumstances when those sales are unrepresentative and extremely distortive.'" American Silicon Techs. v. United States ("American Silicon"), 24 CIT __, __, 110 F. Supp. 2d 992, 995 (2000) (quoting FAG U.K. Ltd. v. United States ("FAG U.K."), 20 CIT 1277, 1281-82, 945 F. Supp. 260, 265 (1996)).

During the POR, Windmill shipped two sales to the United States for the purpose of initiating an administrative review that had a deadline of July 31, 1997. See Rescission Notice, 63 Fed. Reg. at 47,232. Windmill's first sale was a "test shipment" sent by ocean carrier to an unaffiliated United States purchaser.[5] See id. "When it became apparent in late July 1997 that [the first] sale would not enter U.S. [C]ustoms territory during the POR," Windmill and the same United States purchaser from the first sale negotiated a second sale which consisted of two CSPs that weighed 1.112 metric tons and entered United States Customs territory by air on the last day of the POR (that is, July 31, 1997). Id.

---

[5] Windmill's "test shipment" sent by ocean carrier is not at issue in this case because it "entered U.S. [C]ustoms territory after the POR." Rescission Notice, 63 Fed. Reg. at 47,232; see also Domestic Producers' Resp. to Windmill's Rule 56.2 Mot. J. Agency R. ("Domestic Producers' Resp.") Ex. 3 (Windmill's Revised Section C Response to Commerce indicating that the sole entry during the POR consisted of two CSPs that weighed 1.112 metric tons).

On July 24, 1998, Domestic Producers argued that Windmill's sale shipped by air to the unaffiliated United States purchaser was a non-bona fide sale and requested that Commerce rescind the administrative review. See id.

Commerce, in a letter dated August 13, 1998, explained to Windmill that its sale of the two CSPs weighing 1.112 metric tons was not a bona fide sale because:

> a. The cost of the air freight, customs fees, brokerage expenses, warehousing, and miscellaneous expenses (which were borne by the U.S. [purchaser], and not Windmill) was significantly greater than the total value of the sale.
> b. By Windmill's own admission, the decision to send the shipment by air, rather than by ocean, was based solely on the need to enter the merchandise into the United States before the end of the POR. There was no customer emergency or particular need for costly air shipment rather than the usual surface shipment.
> c. The quantity of the sale was atypical of that which Windmill normally sells to the U.S. [purchaser], which was a trading company and not an end-user.
> d. The U.S. [purchaser's] purchase of the merchandise prior to receiving an order for it from a customer was atypical of its normal business practice.
> e. The same legal counsel guided both Windmill and the U.S. [purchaser] through the sales process, and by [Windmill's] admission helped negotiate a price for the sale solely for the purpose of obtaining for Windmill a lower cash deposit rate. There is no evidence that any commercial factors that normally influence price negotiations played any role in setting the price for this sale.
> f. The U.S. [purchaser] resold the merchandise at a substantial loss.

Rescission Notice, 63 Fed. Reg. at 47,233.

Commerce "found these factors significant in light of the fact that the grade [of the CSPs] involved in this sale was one of the cheapest and most common grades of steel."  Id.  Therefore, Commerce determined that the sale from Windmill to the United States purchaser was non-bona fide because it was commercially unreasonable and atypical of Windmill's and the United States purchaser's  selling procedures.  See id.

### B.    Contentions of the Parties

#### 1.    Windmill's Contentions

Windmill argues that Commerce created a "novel" and "opaque" legal standard when it determined that Windmill's sale was not bona fide because it "was not 'commercially reasonable' and . . . was atypical of Windmill's and the [United States purchaser's] normal business practices."  Windmill's Br. Supp. Mot. J. Agency R. ("Windmill's Br.") at 20.  In particular, Windmill contends that Commerce's commercial reasonableness standard to determine whether a sale is bona fide is unlawful because it gives Commerce discretion to exclude a test sale that is not in the "ordinary course of trade."[6]  See id. at 22-25, 35-39.  Moreover, Windmill

---

[6]  Windmill argues that sales not in the ordinary course of trade can only be excluded from the NV calculation, and not from the United States price (i.e., EP or constructed export price). See Windmill's Br. at 35-39.

Windmill also contends that changes in the trademark law

argues that Commerce's application of the commercial reasonableness standard: (1) will result in permanent exclusion orders rather than remedial orders, see Windmill's Br. at 49; (2) does not recognize that "the antidumping order and the high cash deposit rate, in fact operate as the single most important commercial facts that an exporter and importer must deal with in exporting Romanian steel to the United States[,]" id. at 22; (3) ignores that "there is nothing commercially normal about any test shipment [because,] by definition it differs from the normal course of business [since] it is the first sale in what the respondent hopes to establish as a major new market[,]" Rescission Notice, 63 Fed. Reg. at 47,233; and (4) is an arbitrary and capricious standard that "violates the URAA's purpose of making antidumping procedures more transparent." Id.; see generally, Windmill's Br. at 52-57.  Windmill also points out that the dictionary definition of "bona fide" does not include "commercially reasonable" or "typical of normal business practices" language.  See Windmill's Br. at 29-31.

---

indicate that "Congress knows the difference between 'bona fide' sales and sales 'in the ordinary course of trade'" and maintains that "[i]f Congress wanted . . . Commerce to have the discretion to exclude U.S. sales that were commercially unreasonable, it would have included the words 'in the ordinary course of trade' in the U.S. sales statutory language[]" just the way it did in the trademark law.  Windmill's Br. at 43; see id. at 33, 39-45.  The Court finds Windmill's argument too tenuous to entertain and does not infer that Congressional intent found in the trademark law could be automatically imported into the antidumping statute.

Relying on <u>Chang Tieh Indus. Co. v. United States</u> ("<u>Chang Tieh</u>"), 17 CIT 1314, 1318-19, 840 F. Supp. 141, 146 (1993), Windmill maintains that the Court has established a bright-line standard whereby Commerce can exclude a sale as being non-bona fide only if it is fraudulent. <u>See id.</u> at 22-30. Windmill argues that the sale at issue was not fraudulent "because Windmill did not attempt to deceive [Commerce] by using an abnormally high price so as to obtain a low dumping margin[,]" Windmill's sale "was not a fictitious sale[,]" and "Windmill itself made a profit on the sale." <u>Id.</u> at 21. Windmill also argues that it is permissible to structure a sale to get a lower cash deposit rate.[7] <u>See id.</u> at 32. Windmill, therefore, contends that since its shipment was sold at a market price and arm's length, it is a bona fide sale. <u>See Rescission Notice</u>, 63 Fed. Reg. at 47,233.

In addition to the above arguments, Windmill attempts to rebut Commerce's findings. <u>See</u> Windmill's Br. at 57-65; <u>see also</u>, <u>Rescission Notice</u>, 63 Fed. Reg. at 47,233-34.

---

[7] The fact that the sale at issue was a single test sale to lower cash deposit rates is not a contested issue in this case. In its brief, Commerce states that such a purpose "does not make an otherwise valid sale not <u>bona fide</u>." Def.'s Mem. Opp'n Pl.'s Mot. J. Agency R. ("Def.'s Mem.") at 17. Moreover, Commerce "recognizes that exporters may make only a single sale in order to establish their own antidumping duty rate, particularly where the 'all others' rate is high." <u>Rescission Notice</u>, 63 Fed. Reg. at 47,234.

First, Windmill contends that it is irrelevant that the total value of the sale was less than the expenses borne by the United States purchaser (that is, freight, customs fees, brokerage expenses, warehousing and miscellaneous expenses) because "the terms of sale were ex-works, loaded on truck[,]" and "it [is] commercially reasonable for the U.S. [purchaser] to pay higher transportation costs in order to complete a test sale and to get the current cash deposit rate lowered."  Id. at 47,233.

Second, Windmill argues that its shipment to the United States purchaser by air was not fraudulent and entailed "a commercial need . . . to have the sale enter U.S. [C]ustoms territory by July 31, 1997."  Id. at 47,234.

Third, with regards to Commerce's determination that Windmill's sale was atypical of the quantity it normally sold to the United States purchaser and atypical of its normal business practices with the United States purchaser, Windmill maintains that since its shipment to the United States purchaser was a test shipment, "there is no 'typical quantity'" and "it is irrelevant whether the selling procedures were typical."  Id.

Fourth, Windmill argues that Commerce is incorrect in its determination that "the same legal counsel [for Windmill and the

United States purchaser] helped negotiate a price for the sale."[8]

Id.

Finally, Windmill contends that the United States purchaser's selling of the product at a substantial loss to a subsequent buyer is irrelevant in determining whether Windmill's sale to the United States purchaser was bona fide because "[t]he antidumping statute allows [Commerce] to analyze the price of a sale of the subject merchandise between an exporter and the first unaffiliated U.S. [purchaser][;] . . . [i]t does not allow [Commerce] to conduct an

---

[8] The record consists of conflicting statements as to how the price for Windmill's sale at issue was established. See, e.g., Windmill's Br. Ex. 4 at 26 (showing that in Windmill's August 21, 1998, response letter to Commerce, Windmill notes that its employee in a March 25, 1998, letter to Commerce stated that "[s]ince Romanian steel is not imported into the US there is no true market guideline[;] I set the price based on two Russian prices quoted amongst steel trading friends at the time"); Def.'s Mem. Ex. 3 at 6 (showing that in Windmill's January 16, 1998, response to Commerce's supplemental questionnaire, Windmill stated that its employee "initiated price negotiations by soliciting [the United States purchaser's] offer on price for a specified quantity, which [the United States purchaser] issued and Windmill accepted"); Def.'s Mem. Ex. 2 at 5 (showing that in Windmill's March 3, 1998, responses to Commerce's supplemental questionnaire #2, Windmill states that the United States purchaser "accepted the price proposed by Windmill based on advice of counsel"); Def.'s Proprietary Ex. 2 (stating that the United States purchaser "was guided throughout this process by the advice of [one of plaintiff's] trade counsel"). Moreover, Windmill alleges that Commerce was to submit a document to the Court indicating that Windmill's trade "counsel did not negotiate the price between Windmill" and the United States purchaser. Windmill's Br. at 59; see also id. at n.3. The Court has not received such document from Commerce and will therefore consider the conflicting evidence regarding the pricing of Windmill's sale in toto when rendering its decision.

antidumping review based on the sale price between an unaffiliated U.S. [purchaser] and the subsequent customer." Windmill's Br. at 61-62. Windmill, therefore, requests that Commerce's decision to rescind the administrative review at issue be reversed. See id. at 66.

### 2. Commerce's Contentions

Commerce responds that it properly exercised its discretion in rescinding the administrative review at issue when it "review[ed] the totality of the circumstances surround[ing] [Windmill's] sale" to determine that Windmill's sale was commercially unreasonable and therefore not bona fide. Def.'s Mem. at 12; see also id. at 10-16. In particular, Commerce maintains that Chang Tieh, 17 CIT at 1318-19, 840 F. Supp. at 146, and PQ Corp. v. United States ("PQ Corp."), 11 CIT 53, 55-58, 652 F. Supp. 724, 728-29 (1987), set forth the following criteria in determining whether a sale is bona fide:

    (i)   the sale must be at arm's length, and have prices
          that are negotiated and not artificially set,
    (ii)  the sale must be consistent with good business
          practices, and
    (iii) the sales procedures must be typical of the
          parties' normal business practice.

Def.'s Mem. at 11. Relying on this criteria and departmental precedent, Commerce contends that its commercial reasonableness

standard is not "new" and "opaque".[9]  See id. at 13.  Moreover, Commerce argues that Windmill's suggestion that non-bona fide is synonymous with fraudulent is incorrect.  See id. at 16.  Commerce asserts that "[a]lthough there can be no question that fraudulent sales are not bona fide, it does not necessarily follow that all non-fraudulent sales are bona fide."  Id. at 13.

Commerce also asserts that Windmill's argument that Commerce's commercial reasonableness standard is unlawful because it excluded Windmill's sale as being outside the ordinary course of trade "is based upon a misinterpretation of the law."  Def.'s Mem. at 13.  In particular, Commerce argues that

> [a]lthough the antidumping statute limits the calculation of foreign market value to "sales made in the ordinary course of trade," Chang Tieh, 840 F. Supp. at 145, it does not include similar limitations in its definition of U.S. price.  The lack of this limiting language does not preclude [Commerce] from examining the conditions and

---

[9] In the Rescission Notice, Commerce provides an example to rebut Windmill's contention that its commercial reasonableness standard is new and opaque when it states that

> in Manganese Metal from the Peoples' Republic of China, 60 Fed. Reg. 56,045 (Nov. 6, 1995) . . . based on the timing of the single sale by one respondent relative to the filing of the petition, the price, which was significantly higher than the market price, and other commercially unusual facts about the transaction (these were proprietary), [Commerce] found that the sale was not bona fide and disregarded it.

63 Fed. Reg. at 47,234.

practices normal in the trade under consideration with respect to the subject merchandise, i.e., the ordinary course of trade, to determine whether or not a sale is bona fide.

Id. at 14.

Moreover, Commerce contends that its commercial reasonableness methodology will not result in permanent exclusion orders that will prevent new shippers from obtaining their own rates because "single sales, even those involving small quantities, are not inherently commercially unreasonable and do not necessarily involve selling practices atypical of the parties' normal selling practices." Rescission Notice, 63 Fed. Reg. at 47,234.

Commerce further points out that it did not determine whether Windmill's sale was at arm's length, but "found it dispositive that 'there is no evidence that any commercial factors that normally influence price negotiations played any role in setting the price for this sale.'" Def.'s Mem. at 18 (quoting Rescission Notice, 63 Fed. Reg. at 47,233). In particular, Commerce considered the conflicting record evidence on how Windmill's sale was priced, that is, Windmill's various submissions that: (1) the price was based on two Russian prices; (2) Windmill proposed the price based on the advice of its trade counsel; or (3) Windmill solicited a price from the United States purchaser. See Def.'s Mem. at 18-20. Commerce also stated that

> [t]he extraordinary high transportation costs incurred by
> the importer, combined with other expenses borne by the
> importer in connection with this sale and the fact that
> the merchandise was subsequently resold at a significant
> loss (excluding transportation and other costs) lead[s]
> [Commerce] to conclude that there is no basis upon which
> it could be found that the sale was commercially
> reasonable.

Rescission Notice, 63 Fed. Reg. at 47,234.

Moreover, Commerce contends Windmill did not provide any commercial explanation as to why the United States purchaser incurred high air-freight costs in order to import the most common grade of steel plate.  See Def.'s Mem. at 21-22.

Next, Commerce maintains that the sale between Windmill and the United States purchaser was atypical on the following grounds: (1) "six months prior to and subsequent to the sale [at issue], Windmill made sales [of different merchandise] to the same U.S. purchaser in quantities that were substantially larger than the test sale quantity," id. at 23; and (2) "the U.S. purchaser acted abnormally when it purchased the subject merchandise from Windmill without first having an order from a customer[,]" took possession of the merchandise and paid warehousing fees for two weeks, especially since the "U.S. purchaser 'functions as a trading company that does not take physical possession of the merchandise.'" Id. at 23-24 (quoting Def.'s Mem. Ex. 2 at 9). Therefore, Commerce  concludes that Windmill's sale was not bona

fide because it was not commercially reasonable and was atypical of the normal business practices between Windmill and the United States purchaser. See Def.'s Mem. at 25.

### 3. Domestic Producers' Contentions

Domestic Producers support Commerce's determination to rescind the administrative review at issue on the basis that Windmill's sale to the United States purchaser was not a bona fide sale. See Domestic Producers' Resp. at 8-22. Domestic Producers point out that Windmill's sale was: (1) not at arm's length because "Windmill and [the United States purchaser] artificially set the price for the sale . . . [when they] fixed a price and structured the arrangement to 'protect Windmill from legal attack in the present proceedings[,]" id. at 16, Ex. 5 at 6; (2) not a commercially reasonable transaction between Windmill and the United States purchaser because it was not "'consistent with good business practices' for the U.S. [purchaser] to purchase" the most common grade of steel and ship it by air only "to take a total loss on the transaction," that is, it was not good business practice for the United States purchaser to purchase products from Windmill without "'considerable savings,'" Domestic Producers' Resp. at 19 (quoting PQ Corp., 11 CIT at 58, 652 F. Supp. at 729); and (3) atypical of the United States purchaser's normal business practice to: (a) order a small quantity of steel; (b) not have a particular order

before ordering the steel from Windmill; and (c) pay for two weeks of warehousing after taking possession of the test shipment. See Domestic Producers' Resp. at 21-22.

Moreover, Domestic Producers maintain that Windmill's argument that non-bona fide is synonymous to fraud is incorrect because Windmill relies on a civil or criminal definition of fraud. See id. at 23-25.

## C. Analysis

The Court disagrees with Windmill that Commerce is limited to finding a sale non-bona fide only if Commerce determines that sale is fraudulent.[10] Pursuant to 19 U.S.C. § 1675(a)(2)(A), Commerce is required to determine "the [NV] and [EP] . . . of each entry of the subject merchandise" when determining antidumping duties. However, this Court has held that "Commerce can . . . exclude sales from [United States price] in an administrative review in exceptional circumstances when those sales are unrepresentative and extremely distortive." FAG U.K., 20 CIT at 1281-82; 945 F. Supp. at 265. Sales should be excluded only "in those limited situations in which [Commerce] finds that inclusion of certain sales which are

---

[10] The Court does not dispute that a fraudulent sale is a non-bona fide sale. However, the Court does not agree with Windmill that a criminal or civil standard of fraud be applied in antidumping cases.

clearly atypical would undermine the fairness of the comparison of foreign and U.S. sales." Ipsco, Inc. v. United States, 714 F. Supp. 1211, 1217, 13 CIT 402, 408 (1989), rev'd in part on other grounds, 965 F.2d 1056 (Fed. Cir. 1992); see also Chang Tieh, 17 CIT at 1318-19, 840 F. Supp. at 145-46 (exclusion of sales may be necessary to prevent a fraud on Commerce's proceedings); PQ Corp., 11 CIT at 58, 652 F. Supp. at 729 ("U.S. [purchaser's] actions were consistent with good business practices of purchasing acceptable material at considerable savings"). Moreover, in American Permac, Inc. v. United States, the Court determined that:

> regular exclusion of sales not in the ordinary course of trade only occurs on the home-market-sales side of the price comparison. . . . It does not follow inexorably, however, that every U.S. sale of the merchandise under investigation must be included in every case. . . .
>
> The distinction is that while U.S. sales outside the ordinary course of trade ordinarily should be included (this may be the very cause of injury), a methodology is to be applied which accounts for sales which are unrepresentative and which do not lead to a fair price comparison.

16 CIT 41, 42, 783 F. Supp. 1421, 1423 (1992).

"Fair (apples to apples) comparison is the goal of the price comparisons required by the antidumping laws, as the courts have stated time and again." Id., 16 CIT at 42, 783 F. Supp. at 1423 (citing U.H.F.C. Co. v. United States, 916 F.2d 689, 697 (Fed. Cir. 1990); Smith-Corona v. United States, 713 F.2d 1568, 1578 (Fed. Cir. 1983), cert. denied, 465 U.S. 1022 (1984); AOC Int'l, Inc. v.

United States, 13 CIT 716, 718, 721 F. Supp. 314, 317 (1989)).

Given Commerce's discretion in employing a methodology to exclude sales from the United States price that are unrepresentative or distortive, that is, non-bona fide ones, the Court must determine whether Commerce's actions in this case were reasonable. See Peer Bearing Co. v. United States, 2001 Ct. Intl. Trade. LEXIS 138, *46, Slip. Op. 01-125 (October 25, 2001)(quoting Timken Co. v. United States, 23 CIT 509, 516, 59 F. Supp. 2d 1371, 1377 (1999)) ("'In the absence of a statutory mandate to the contrary, Commerce's actions must be upheld as long as they are reasonable'"); see also Chevron, 467 U.S. at 844-45.

During the POR, Commerce "review[ed] the totality of the circumstances surround[ing] [Windmill's] sale" (that is, inter alia, whether the sale was at arm's length, whether the sale was consistent with good business practices, whether the sale was typical of Windmill's and the United States purchaser's normal business practices) to determine whether Windmill's sale was commercially unreasonable and, therefore, not bona fide. Def.'s Mem. at 12; see also Def.'s Mem. at 10-16. Commerce applied its commercial reasonableness methodology and determined that Windmill's sale to the United States purchaser was a non-bona fide sale. See Rescission Notice, 63 Fed. Reg. at 47,234. Commerce's reasons for determining that Windmill's sale was non-bona fide

included: (1) the fact that "[t]here [was] no evidence that any commercial factors that normally influence price negotiations played any role in setting the price for this sale"; (2) the extraordinary high air freight cost and other expenses incurred by the United States purchaser that were "significantly greater than the total value of the sale"; (3) the fact that "the decision to send [the most common grade of steel] by air . . . was based solely on the need to enter the merchandise into the United States before the end of the POR" and that there was no commercial need or emergency to ship the sale by air; (4) the atypical quantity of the sale; and (5) the fact that the United States purchaser's possession and warehousing of the shipment along with its failure to have an order before purchasing the shipment was atypical of the United States purchaser's normal business practice of being a trading company.[11]  Rescission Notice, 63 Fed. Reg. at 47,233.

---

[11]  In its March 3, 1998, response to Commerce, Windmill states that the United States purchaser:

> functions as a trading company that does not take physical possession of the merchandise. Like other trading companies in this business, [the United States purchaser] either initiates contact with a potential buyer or responds to inquiries from potential buyers. Its function is similar to a broker or sales agent, and, therefore, it does not take physical possession of the merchandise.

Def.'s Mem. Ex. 2 at 9.

Reviewing the evidence <u>in toto</u>, the Court concludes that Commerce's application of its commercial reasonableness methodology, as well as Commerce's finding that Windmill's sale at issue was not bona fide, is reasonable, is supported by substantial evidence and is in accordance with law.

The Court further finds that Windmill's argument that Commerce's commercial reasonableness methodology will result in exclusion orders rather than remedial orders is without merit. The Court agrees with Commerce that "single sales, even those involving small quantities, are not inherently commercially unreasonable and do not necessarily involve selling practices atypical of the parties' normal selling practices." <u>Rescission Notice</u>, 63 Fed. Reg. at 47,234; <u>see, e.g.</u>, <u>American Silicon</u>, 24 CIT at __, 110 F. Supp. 2d at 998 (finding that one sale made by a foreign producer to a United States purchaser was bona fide because, <u>inter alia</u>, (1) it was a shipment made to a new customer that was an end-user and the end-user, that is, the United States purchaser, did not resell "the merchandise at a loss"; (2) although there were high air freight costs involved, "Commerce observed that the shipment arrived a number of months prior to the end of the review period . . . and [the foreign producer] never requested this review, nor is there any evidence that it contemplated doing so"; (3) the "U.S. [purchaser] requested the mode of shipment and [the foreign

producer] merely complied with its request"; (4) "the quantity purchased was consistent with this being a test sale"; and (5) "Commerce . . . found that 'the fact that the buyer did not issue a purchase order until after [the foreign producer] had shipped the subject merchandise [was] not such a significant deviation from typical commercial practice as to call into question, inter alia, the commercial reasonableness of the transaction.'" Id., 24 CIT at __, 110 F. Supp. 2d at 997, (quoting Silicon Medal From Brazil: Notice of Final Results of Antidumping Duty Administrative Review, 64 Fed. Reg. 6305, 6317 (Feb. 9, 1999)); Rescission Notice, 63 Fed. Reg. at 47,233 (stating that in the review at issue, Commerce "explained that it intended to review Windmill's first sale (if a review is requested) in the review of the period covering the date on which the sale entered U.S. [C]ustoms territory").

Accordingly, the Court sustains Commerce's decision to rescind the administrative review at issue.

**CONCLUSION**

Commerce's rescission of the antidumping duty administrative review entitled <u>Certain Cut-to-Length Carbon Steel Plate From Romania: Notice of Rescission of Antidumping Duty Administrative Review</u>, 63 Fed. Reg. 47,232 (Sept. 4, 1998) is affirmed.  This case is dismissed.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:    February 21, 2002
          New York, New York