AMERICAN SILICON TECHNOLO-GIES, Elkem Metals Company and Globe Metallurgical, Inc., Plaintiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee,

and

Rima Industrial S/A, Defendant–Appellee,

and

General Electric Company, Defendant–Appellee.

No. 00–1400.

United States Court of Appeals, Federal Circuit.

Aug. 16, 2001.

Clifford E. Stevens, Jr., Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, argued for plaintiffs-appellants. With him on the brief was William D. Kramer. Of counsel was Martin Schaefermeier, Baker & Botts, L.L.P., of Washington, DC.

Reginald T. Blades, Jr., Senior Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, argued for defendant-appellee United States. With him on the brief was David M. Cohen, Director. Of counsel on the brief were John D. McInerney, Chief Counsel; Elizabeth C. Seastrum, Senior Counsel; Mark A. Barnett, Senior Attorney; and John F. Koeppen, Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, of Washington, DC.

Philippe M. Bruno, Dorsey & Whitney LLP, of Washington, DC, for defendant-appellee Rima Industrial S/A. With him on the brief was Kevin B. Bedell.

Michael H. Stein, Dewey Ballantine LLP, of Washington, DC, argued for defendant-appellee General Electric Company. . With him on the brief were Bradford L. Ward and Andrew J. Conrad. Of counsel was Jennifer Danner Riccardi.

Before LOURIE, BRYSON, and LINN, Circuit Judges.

LINN, Circuit Judge.

American Silicon Technologies, Elken Metals Company, and Globe Metallurgical, Inc. (collectively "AST" or "appellants") appeal the judgment of the United States Court of International Trade affirming the United States Department of Commerce's ("Commerce") reliance on the depreciation expenses reported by Rima Industrial S/A ("Rima") in determining Rima's dumping margin for imported silicon metal. *Am. Silicon Techs. v. United States*, No. 98–03–00567 (Ct. Int'l Trade Mar. 9, 2000). Because Commerce's decision to use Rima's reported depreciation is supported by substantial evidence and is otherwise in accordance with law, we affirm.

## BACKGROUND

On July 31, 1991, Commerce published an antidumping duty order on silicon metal from Brazil. *Antidumping Duty Order: Silicon Metal from Brazil,* 56 Fed.Reg. 36,135 (July 31, 1991). In response to Commerce's Notice of Opportunity to Request Administrative Review published in July 1996, Rima and several other Brazilian producers of silicon metal requested Commerce initiate an administrative re-

view covering entries of the subject merchandise for the period of July 1, 1995 to June 30, 1996. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 61 Fed.Reg. 42,416 (Aug. 15, 1996). Following an extensive investigation, that included verification by Commerce of Rima's records, on February 11, 1998, Commerce concluded that silicon metal from Brazil produced by Rima and others was being sold at less than fair value ("LTFV"). Moreover, Commerce calculated a 3.08% dumping margin for Rima from the period of March 1, 1995 to February 29, 1997. *Silicon Metal from Brazil; Notice of Final Results of Antidumping Duty Administrative Review*, 63 Fed.Reg. 6,899 (Feb. 11, 1998) ("final results").

AST challenged the final results on several grounds at the Court of International Trade. However, the only issue still in dispute is that relating to Commerce's reliance on Rima's reported depreciation expense in computing Rima's dumping margin. Thus, we limit our discussion of the proceedings before that court to this issue. AST contended before the Court of International Trade that Commerce understated Rima's dumping margin by relying on Rima's reported depreciation expense. According to AST, in view of 19 U.S.C. § 1677b(f)(1)(A) (1994), it was improper for Commerce to rely on Rima's reported depreciation expense because it did not reasonably reflect the costs associated with the production and sale of Rima's silicon metal. AST asserted that Rima improperly shifted the bulk of the depreciation expense, which in this case is that owing to furnaces, to a period prior to the period of review, thereby skewing the calculation of the cost of producing silicon metal in such a manner

as to lower its dumping margin. According to AST, the five-year straight line method used by Rima does not comport with either United States or Brazilian Generally Accepted Accounting Principles ("US GAAP" and "Brazillian GAAP," respectively) because the period of depreciation adopted does not adequately allocate the cost of those assets over their economic useful life. In addition to the inadequate allocation, AST contended that Rima's reported depreciation was unreliable because it was based on depreciation worksheets that were not kept as part of Rima's accounting system and because the reported expense did not reconcile with the fixed asset values stated in Rima's financial statements. Commerce contended that Rima's depreciation method was consistent with Brazilian GAAP and that it reasonably relied on those records.

The Court of International Trade concluded that it was reasonable for Commerce to rely on Rima's reported depreciation expense. The court noted that 19 U.S.C. § 1677b(f)(1)(A) is silent as to the method Commerce must use to establish depreciation expenses in cost of production calculations, but among other things does state that "costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country ... and reasonably reflect the costs associated with the production and sale of merchandise." 19 U.S.C. § 1677b(f)(1)(A). The court also noted that the Statement of Administrative Action ("SAA"), approved by Congress under 19 U.S.C. § 3511(a) (1994), provides that it would be appropriate for Commerce to adjust depreciation expenses "in determining whether a company's records reason-

ably reflect costs, ... [where] a firm's financial statements reflect an extremely large amount of depreciation for the first year of an asset's life, or ... [where] there is no depreciation expense reflected for assets that have been idle." Agreement on Implementation of Article VI of the GATT, Statement of Administrative Action 807, 834–35, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4172. In view of the gap left in the statute and the SAA, the court concluded that its review was limited to determining whether Commerce's interpretation in filling the gap regarding depreciation expense was reasonable and supported by substantial evidence.

The court concluded that Rima's reported depreciation was not in need of adjustment under the SAA because Rima did not take an extremely large amount of depreciation during the assets' first years. In addition, the court concluded that there was substantial evidence showing that the depreciation worksheets prepared for the review did reconcile to the financial statements. In particular, the court pointed out that the financial statements were independently audited, and that the auditors reported a depreciation expense in their audit opinion of the financial statements and confirmed adherence to a permissible depreciation methodology under Brazilian GAAP for that expense. Furthermore, the court concluded that AST had not provided any verifiable records that the depreciation worksheets were not consistent with Brazilian GAAP, or that the reported depreciation did not reconcile to the financial statements.

The court also noted that U.S. GAAP does not support AST's position any better than Brazilian GAAP. In particular, the court pointed out that U.S. GAAP does not set forth specifics regarding the estimated useful life of assets or the required depreciation methodology that a company must use, and that both may differ from company to company and across industries. In addition, the court recognized that whether an asset is used longer than its estimated useful life does not require that a longer useful life be used in the depreciation calculation because useful life and physical life, i.e., the amount of time that machinery and equipment actually operate, are not necessarily the same. Accordingly, the court concluded that as long as a company reasonably and consistently matches revenue and expense by allocating the cost of depreciable assets systematically over their estimated useful lives, U.S. GAAP is satisfied. For all of the foregoing reasons, the Court of International Trade concluded that the evidence and reasonable inferences from the record support Commerce's decision to rely on Rima's reported depreciation expense in its dumping margin calculations.

AST timely appealed the decision of the Court of International Trade to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(5)(1994).

## DISCUSSION

### A. Standard of Review

We review a decision by the Court of International Trade of an antidumping determination by Commerce by applying anew the statutory standard of review that the court applied in reviewing the administrative record. *Micron Tech., Inc. v. United States,* 117 F.3d 1386, 1393 (Fed.Cir.1997). Accordingly we will "uphold Commerce's determination unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Id.* (quoting 19 U.S.C.

§ 1516a(b)(1)(B)(i) (1994)). Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence. *Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1044 (Fed.Cir. 1996).

## B. Cost of Production

As indicated previously, there is only one issue on appeal. That issue is whether Commerce's reliance on Rima's depreciation records in its final administrative review comports with the statutory requirements of 19 U.S.C. § 1677b(f)(1)(A).

▮▮▮ Commerce is required to impose an antidumping duty on imported merchandise that is being sold, or is likely to be sold, in the United States at less than its fair value to the detriment of a domestic industry. 19 U.S.C. § 1673(1)-(2) (1994); *Koyo Seiko Co., Ltd. v. United States,* 258 F.3d 1340, 1342 (Fed.Cir.2001). The amount of the duty equals "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673. Normal value is "the price at which the foreign like product is first sold ... for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as [the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, i.e.,] the export price or [the price at which the subject merchandise is first sold (or agreed to be

sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, i.e., the] constructed export price." 19 U.S.C. §§ 1677b(a)(1), 1677a(a)-(b); *cf. SKF USA Inc. v. United States,* 254 F.3d 1022, 1025–26 (Fed.Cir.2001). Under specified circumstances, when Commerce has reasonable grounds to believe that sales of the foreign like product under consideration for the determination of normal value were less than the cost of production, the statute mandates calculation of "constructed value" ("CV") in lieu of normal. 19 U.S.C. § 1677b(b); *cf. SKF,* 254 F.3d at 1026. The CV serves as a minimum price level at which imported goods may be sold without incurring antidumping duties. *Thai Pineapple Pub. Co. v. United States,* 187 F.3d 1362, 1365 (Fed. Cir.1999). Goods sold for less than the CV are assessed duties in an amount designed to bring their effective price to the importer up to the minimum level. *Id.* CV amounts are to include general expenses. 19 U.S.C. § 1677b(e). The cost of general expenses includes overhead. *IPSCO, Inc. v. United States,* 965 F.2d 1056, 1059 (Fed. Cir.1992). Depreciation is a part of overhead costs, which are costs of production. If depreciation is not included in production costs, the CV is lowered, thereby lowering the minimum price level at which imported goods may be sold without incurring antidumping duties, i.e., lowering the dumping margin calculations.

## 1. Depreciation Accounting

The basic purpose of depreciation is to spread the cost of a capital asset over the accounting periods that benefit from the asset's use. Kermit D. Larson and Paul

B.W. Miller, *Fundamental Accounting Principles* 532 (13th ed.1993). Without the benefit of hindsight, the beneficial period of an asset's use, i.e., useful life, is necessarily an estimate, and it is usually not the same as actual life. *Id.* at 533. This estimate takes into account the decrease in the service potential of the asset resulting from such causes as physical wear and tear through ordinary use, as well as obsolescence caused by technological changes and the introduction of new and better machinery and methods of production. *Id.*

Although this type of cost-spreading is an estimate, under GAAP it is nevertheless supposed to be systematic and rational. *Id.*; Glenn L. Johnson and James A. Gentry, *Finney and Miller's Principles of Accounting* 287 (8th ed.1980). A variety of generally accepted methods for allocating depreciation expenses of an asset exist, such as straight line, units of production, sum-of-the-years-digits, and double declining balance.[1] *Id.*; Johnson at 287. While GAAP requires the method chosen to be a reasonable reflection of the use of the asset, any method chosen is going to be artificial because depreciation is an allocation process as opposed to a valuation process. *Id.*; Johnson at 287.

### 2. Statutory Landscape

19 U.S.C. § 1677b(f)(1)(A) provides that for purposes of CV calculations:

Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country ... and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

19 U.S.C. § 1677b(f)(1)(A).

■ In other words, the statute provides that as a general rule, an agency may either accept financial records kept according to generally accepted accounting principles in the country of exportation, or reject the records if accepting them would distort the company's true costs. *Thai Pineapple*, 187 F.3d at 1362; *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1206 (Fed.Cir.1995).

We turn next to the SAA, which is regarded as an authoritative expression by the United States concerning the interpretation and application of the foregoing statute. The SAA provides:

In determining whether a company's records reasonably reflect costs, Commerce will consider U.S. generally accepted accounting principles employed by the industry in question. For example, a company's records might not fairly allocate the cost of an asset if a firm's financial statements reflect an extremely

---

1. The latter two methods are commonly referred to as accelerated depreciation methods because larger depreciation amounts are allocated to early years of an asset's estimated useful life. Johnson at 290. AST contends that Rima's depreciation methodology is an accelerated method. However, this is inaccurate as Rima allocated the amount to be depreciated equally over the estimated useful life, i.e., Rima used a straight line method.

large amount of depreciation for the first year of an asset's life, or if there is no depreciation expense reflected for assets that have been idle. In such a situation, it would be appropriate for Commerce to adjust depreciation expenses. Costs shall be allocated using a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation or review. Commerce also will consider whether the producer historically used its submitted cost allocation methods to compute the cost of the subject merchandise prior to the investigation or review and in the normal course of its business operations. Also, if Commerce determines that costs, including financing costs, have been shifted away from production of the subject merchandise, or the foreign like product, it will adjust cost appropriately, to ensure they are not artificially reduced.

Agreement on Implementation of Article VI of the GATT, 834–35, *reprinted in* 1994 U.S.C.C.A.N. at 4172.

Neither the statute nor the SAA instructs Commerce as to the methodology it must use to establish depreciation expenses in CV calculations. Consequently, our review focuses on whether Commerce was *reasonable* in accepting the depreciation methodology of Rima. *United States v. Mead Corp.*, —— U.S. ——, 121 S.Ct. 2164, 2172, 150 L.Ed.2d 292 (2001) (noting that where the legislative delegation to an agency of interpretive authority is implicit, "a reviewing court ... is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable."); *See also Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S.

837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Thai Pineapple*, 187 F.3d at 1362; *Daewoo Elec. Co. v. Int'l Union*, 6 F.3d 1511, 1516 (Fed.Cir.1993).

It is with the foregoing background in mind that we analyze the parties' contentions and the record to assess Commerce's reasonableness in relying on Rima's reported depreciation expense.

## C. Analysis

 Relying on the same arguments it made before the Court of International Trade, AST contends that Commerce's reliance on Rima's reported depreciation was improper because this expense does not reasonably reflect Rima's cost of producing silicon metal. In particular, AST contends that costs were shifted away from Rima's production during this period of review by Rima's allocation of a five-year useful life for its furnaces. According to AST, the record demonstrates that the useful life of Rima's furnaces is at least twenty years. AST notes that the Brazilian income tax regulations that Rima used to support its depreciation methodology state that the annual rate of depreciation for an asset for income tax purposes is determined based on "one-half of the useful life admitted for the asset acquired as new" and can be further accelerated for assets used in two eight-hour shifts or three eight-hour shifts. AST asserts that Rima arrived at an annual rate of twenty percent for these assets, correlating to a five-year useful life, by taking one-half of the normal twenty year useful life, assigning it a corresponding depreciation rate and then doubling that rate to account for the use of the furnaces in three eight-hour shifts. According to AST, the foregoing confirms that the normal, i.e., non-accelerated, depreciation for the silicon metal furnaces is twenty years.

AST also notes that the record reflects that the furnaces at issue had been operating far longer than five years. In addition, AST contends that Rima reported a twenty-year useful life for furnaces in an earlier administrative review covering the 1992–1993 period. AST also notes that another Brazilian producer of silicon metal has acknowledged that furnaces have a twenty-year useful life. Thus, AST argues, as a matter of law, it could not have been reasonable for Commerce to rely on Rima's reported depreciation expense where Rima assigned its furnaces a five-year useful life.

In addition, AST notes that 19 U.S.C. § 1677b(f)(1)(A) states that Commerce shall consider the exporter's or producer's records on allocation of costs only if the records of the exporter or producer have been historically used by the exporter or producer. According to AST, Rima had not historically recorded depreciation in its accounting or financial statements. Consequently, AST argues that 19 U.S.C. § 1677b(f)(1)(A) prohibits Commerce from relying on Rima's reported depreciation expense.

AST also asserts that it was not reasonable for Commerce to rely on Rima's reported depreciation expense because contrary to Commerce's determination, the values reported do not tie to Rima's financial statements.

Finally, AST notes that four months prior to its appeal at the Court of International Trade, that court decided the precise issue before us based on virtually identical facts. *Am. Silicon Techs. v. United States*, No. 97–02–00267, 1999 WL 354415 (Ct. Int'l Trade Apr. 9, 1999) (the "April 1999 decision"). In that case, the court held that another Brazilian silicon metal producer's use of a five-

year useful life for furnaces was contrary to law. Consequently, AST contends that under the well-established doctrine of intra-court comity the same result should have been reached in this case.

Commerce argues that pursuant to the SAA it will normally accept a company's reported depreciation expense unless there is an extreme allocation of depreciation to the first year, a depreciation of idle assets, a change in depreciation methodology, or a shifting of costs away from the subject merchandise. According to Commerce, none of the foregoing was present in Rima's records. Furthermore, Commerce contends that the expenses were reflected in the independently audited financial statements and the depreciation methodology was consistent with Brazilian GAAP. Thus, Commerce asserts that its reliance on Rima's records was reasonable.

The record reflects that Brazilian GAAP and Brazilian income tax law permit an asset to be expensed over a shorter amount of time when that asset is used continuously instead of only being used in one eight-hour shift per day. Moreover, the record reflects that Rima's furnaces are utilized more than eight hours per day.

As for the historical use of a five-year useful life, it is undisputed in the record that from 1987 to 1995, Rima was not profitable and was in bankruptcy. The record likewise reflects that Rima resumed recording its depreciation expenses in its financial statements in 1996, when it returned to profitability. Thus, a reasonable inference is that during the bankruptcy period, Rima would not have benefited from deducting depreciation expenses for tax purposes whether it used a five-year or twenty-

year useful life. It also is not unreasonable to infer that Rima did not depreciate its assets in its accounting ledgers because of this unprofitability.

The fact that Rima's furnaces have been operating far longer than five years does not negate the reasonableness of a five-year useful life. According to GAAP, even if an asset is used after it has been fully depreciated, the estimated useful life and depreciation methodology can still be consistent with GAAP provided that the cost of the asset is systematically and rationally captured.

Also, the fact that another Brazilian silicon metal producer may have used a twenty-year useful life does not necessitate a finding that all Brazilian companies must use a twenty-year useful life. This is so because the statute does not require that depreciation expense methodologies be uniform across an industry for Commerce to reasonably rely upon them. Rather, as noted above, the statute requires Rima's records be used if they are kept in accordance with the generally accepted accounting principles of Brazil and reasonably reflect the costs associated with the production and sale of the merchandise.

In addition, the record reflects that Rima has consistently calculated depreciation based on a useful life of furnaces consistent with Brazilian income tax regulations that were in effect during the relevant time period of review and that were consistent with Brazilian GAAP. It is true that in the 1992–1993 review, Rima stated generally to Commerce that the useful life of furnaces was twenty years. However, as noted previously, Rima did not record depreciation from 1987 to 1995, when it was not profitable. In other words, Rima did not use any useful life for furnaces in that period of review. Consequently, the mere fact that Rima may have stated that furnaces have a useful life of twenty years in some other period of review does not render Rima's use of a five-year useful life in this period of review inconsistent with Rima's financial records.

The record contains Rima's 1996 audited financial statement, reflecting Rima's financial position for the fiscal year ending December 31, 1995 and December 31, 1996. Rima's independent auditors reported depreciation expenses that Rima should have recognized in that financial statement to adequately represent the asset and financial position of Rima. Because that depreciation amount noted by the auditors was not included in the financial statement, the fixed asset values listed in the financial statement necessarily would not reflect the depreciation amount noted by the auditors. However, the foregoing does not mean that Rima's reported depreciation expense for the review at issue does not reconcile with the financial statement. Rather, as the record evidence shows, both through verification by Rima and by Commerce, Rima's depreciation worksheets reconcile precisely with the depreciation amount reported by the auditors in the qualified opinion. These worksheets calculated depreciation on the monetarily corrected costs using a straight line method over Rima's estimated useful life of the assets.

This court "accords deference to the determinations of the agency that turn on complex economic and accounting inquiries." *Fujitsu*, 88 F.3d at 1044. We hold that determining whether a depreciation practice comports with Brazilian GAAP is one such complex economic and accounting inquiry, as is determining whether reported costs reconcile to financial statements,

particularly where monetary corrections are involved. Moreover, as we noted above, the selection of a useful life for an asset is an estimate. But as long as the asset is spread in a systematic and rational manner over the accounting periods that benefit from its use, then the estimate is deemed to be appropriate under any country's GAAP and can be considered by Commerce to reasonably reflect the costs associated with the production and sale of the merchandise. Where we are faced with two opposing views of the record, it is the function of the court to uphold Commerce's determination if it is supported by substantial evidence and is otherwise in accordance with the law. Here, we are presented with a record that amply supports the reasonableness of Commerce's decision to use the depreciation method set forth in Rima's depreciation worksheets.

As for AST's argument regarding intra-court comity, i.e., a rule that generally dictates that judges of coordinate jurisdiction should follow brethren judges' rulings on identical issues, we note that this doctrine is discretionary. *See Colby v. J.C. Penney Co.,* 811 F.2d 1119, 1124 (7th Cir.1987); *Kelly v. Wehrum,* 956 F.Supp. 1369, 1373 (S.D.Ohio 1997); *Hastings Bldg. Prods. Inc. v. Nat'l Aluminum Corp.,* 815 F.Supp. 228 (W.D.Mich.1993); *Lee v. China Airlines, Inc.,* 669 F.Supp. 979, 981 (C.D.Cal.1987); *Fricker v. Town of Foster,* 596 F.Supp. 1353, 1356 (D.R.I. 1984). In other words, judges of a unified federal district, such as the judges on the Court of International Trade, are not constitutionally or legally bound to march in lockstep. *Fricker,* 596 F.Supp. at 1356. The responsibility for maintaining the law's uniformity is a responsibility of appellate rather than trial judges. *Colby,* 811 F.2d at 1124. Moreover, a judge should be able to depart from the holding of a brother judge of the same district if he is convinced through independent analysis that the holding of his colleague is incorrect. *Lee,* 669 F.Supp. at 981.

In this case, although the results were not identical to that of the April 1999 decision, we note that both judges applied the same legal reasoning. In particular, both judges noted that Commerce must reject GAAP consistent methodologies when they are distortive and do not reflect actual costs. We also note that in the April 1999 decision, the discussion of the depreciation issue by the Court of International Trade was only a scant three paragraphs, two of which were directed to setting forth the parties' arguments. Although the ultimate argument made by the plaintiffs in the earlier case was the same, it is not clear from these paragraphs that the factual record was the same. Thus, it is not at all clear, as AST asserts, that the two judges were faced with identical issues. Consequently, we can only surmise that the judge in this case through her independent analysis found the issues not to be identical or was convinced that her brother judge was wrong. In either case, we cannot say that the doctrine of intra-court comity was abused.

## CONCLUSION

As the Court of International Trade found, Commerce's reliance on Rima's reported depreciation expense is supported by such relevant evidence as a reasonable mind might accept to support a conclusion. Thus, the Court of International Trade's decision sustaining Commerce's use of Rima's reported depreciation expense based on a five-year straight line methodology is affirmed.

*AFFIRMED.*