**Slip Op. 07 – 107**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| ALLIED TUBE & CONDUIT CORP., IPSCO TUBULARS INC., AND WHEATLAND TUBE COMPANY, |  |
| Plaintiffs, | Before: Richard W. Goldberg, Senior Judge |
| v. | Court No. 06-00285 |
| UNITED STATES, | **PUBLIC VERSION** |
| Defendant, |  |
| and |  |
| TOSÇELIK PROFIL VE SAC ENDUSTRISI A.S., |  |
| Defendant-Intervenor. |  |

**OPINION**

[Commerce's final new shipper review determination is remanded for further consideration and explanation of the commercial reasonableness of Defendant-Intervenor's single U.S. sale.]

Dated: July 9, 2007

Schagrin Associates (Roger B. Schagrin, Brian E. McGill, and Michael James Brown) for Plaintiffs Allied Tube & Conduit Corp., IPSCO Tubulars Inc., and Wheatland Tube Company.

Peter D. Keisler, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (David S. Silverbrand); Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (Jennifer I. Johnson), Of Counsel, for Defendant United States.

Law Offices of David L. Simon (David L. Simon) for Defendant-Intervenor Tosçelik Profil ve Sac Endustrisi A.S.

**GOLDBERG, Senior Judge**:  On May 31, 2005, Tosçelik Profil ve Sac Endustrisi A.S. and its affiliated trading company Tosyali Dis Ticaret A.S. (collectively, "Tosçelik") requested that the U.S. Department of Commerce ("Commerce") conduct a new shipper review based on a single U.S. sale during the period of review from May 1, 2004 through April 30, 2005 ("POR").  Commerce found that the single U.S. sale was bona fide, and subsequently determined that a zero percent antidumping duty margin existed.  Certain Welded Carbon Steel Pipe and Tube from Turkey, 71 Fed. Reg. 43444, 43445 (Dep't Commerce Aug. 1, 2006) (final results of new shipper review).  Allied Tube and Conduit Corporation, IPSCO Tubulars, Inc., and Wheatland Tube Company (collectively, "Allied Tube") have brought this action to challenge Commerce's determination that Tosçelik's single U.S. sale during the POR was bona fide.  For the reasons that follow, the Court remands the issue of whether Tosçelik's single U.S. shipment was a bona fide transaction.

## I.   STANDARD OF REVIEW

A court shall hold unlawful Commerce's final determination in an antidumping administrative review if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with the law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i) (2000).  Substantial evidence is "'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" Nippon Steel Corp. v. United States, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001). To determine if substantial evidence exists, the Court reviews the record as a whole, including evidence that supports as well as evidence that "fairly detracts from the substantiality of the evidence." Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II.  DISCUSSION

### A. New Shipper Review and the Bona Fide Sale Test

On May 15, 1986, Commerce published an antidumping duty order on imports of welded carbon steel pipe and tube from Turkey. See Welded Carbon Steel Standard Pipe and Tube Products from Turkey, 51 Fed. Reg. 17784 (Dep't Commerce May 15, 1986) (final determination). The order imposes an "all others" antidumping duty rate of 14.74%, which applies to Turkish producers and exporters that have not had their antidumping duty rate determined in an investigation or review. Id. If a

producer or exporter did not export merchandise that was the subject of an antidumping duty order during a previous investigation period, it may request a new shipper review. See 19 U.S.C. § 1675(a)(2)(B) (2000).[1]  During the course of a new shipper review, Commerce endeavors to establish an individual dumping margin and antidumping duty rate for the new shipper. This process allows the new shipper to demonstrate that the "all others" rate should not apply to its entries.  On May 31, 2005, Tosçelik timely requested a new shipper review based on a single sale to the United States.

_____

[1] A new shipper review may be requested pursuant to the following requirements:

> If the administering authority receives a request from an exporter or producer of the subject merchandise establishing that—(I) such exporter or producer did not export the merchandise that was the subject of an antidumping duty or countervailing duty order to the United States (or, in the case of a regional industry, did not export the subject merchandise for sale in the region concerned) during the period of investigation, and (II) such exporter or producer is not affiliated (within the meaning of section 1677(33) of this title) with any exporter or producer who exported the subject merchandise to the United States (or in the case of a regional industry, who exported the subject merchandise for sale in the region concerned) during that period, the administering authority shall conduct a review under this subsection to establish an individual weighted average dumping margin or an individual countervailing duty rate (as the case may be) for such exporter or producer.

19 U.S.C. § 1675(a)(2)(B)(i) (2000); see also 19 C.F.R. § 351.214 (2006).

When a new shipper review involves only a single U.S. sale, it is Commerce's practice to determine if that sale is a bona fide transaction.  See Freshwater Crawfish Tail Meat from the People's Republic of China, 68 Fed. Reg. 1439, 1440 (Dep't Commerce Jan. 10, 2003) (rescission of new shipper review); Fresh Garlic from the People's Republic of China, 67 Fed. Reg. 11283, 11284 (Dep't Commerce Mar. 13, 2002) (rescission of new shipper review).  A sale is not bona fide when it is "commercially unreasonable" or "atypical of normal business practices."  Tianjin Tiancheng Pharmaceutical Co. v. United States, 29 CIT __, __, 366 F. Supp. 2d 1246, 1249-50 (2005); see also Windmill Int'l Pte., Ltd. v. United States, 26 CIT 221, 230, 193 F. Supp. 2d 1303, 1313 (2002).  Commerce makes this determination so that a producer does not "unfairly benefit from an atypical sale to obtain a lower dumping margin than the producer's usual commercial practice would dictate."  Tianjin, 29 CIT at __, 366 F. Supp. 2d at 1250.  A single sale is not inherently commercially unreasonable, but "it will be carefully scrutinized to ensure that new shippers do not unfairly benefit from unrepresentative sales."  Id. at __, 366 F. Supp. 2d at 1263.

Commerce looks at the totality of the circumstances to determine whether a particular sale is bona fide.  See Hebei New

Donghua Amino Acid Co. v. United States, 29 CIT __, __, 374 F. Supp. 2d 1333, 1338 (2005). In the present case, Commerce initially issued a Commercial Reasonableness Memorandum ("CRM") which set forth its basis for finding that Tosçelik's U.S. sale was commercially reasonable under the totality of the circumstances. See CRM, A-489-501, NSR 5/1/04-4/30/05 (Apr. 24, 2006); Pl.'s App. 5A-B. In the CRM, Commerce considered three factors: (1) the price and quantity of the U.S. sale; (2) the sales process; and (3) freight expenses. Commerce subsequently issued the preliminary results of the new shipper review on May 3, 2006, and found that Tosçelik's sale had no dumping margin. Certain Welded Carbon Steel Pipe and Tube from Turkey, 71 Fed. Reg. 26043, 26047 (Dep't Commerce May 3, 2006) (preliminary results). Commerce subsequently adopted the same position in its final determination. Certain Welded Carbon Steel Pipe and Tube from Turkey, 71 Fed. Reg. at 43445. In that determination, Commerce referred to its Issues and Decision Memorandum ("IDM"), which found Tosçelik's single U.S. sale to be commercially reasonable, and therefore bona fide. IDM, A-489-501, POR 5/1/04-4/30/05 (Aug. 1, 2006), available at http://ia.ita.doc.gov/frn/summary/turkey/E6-12372-1.pdf.

Allied Tube challenges Commerce's determination that Tosçelik's transaction is bona fide. Specifically, it claims

that the price, quantity and freight expense of the sale

indicate that the transaction is not commercially reasonable.

   **B. Commerce's Determination That the Price of Tosçelik's U.S.
      Sale Is Commercially Reasonable Is Not Supported by
      Substantial Evidence**

   **i.   <u>Overview of Commerce's Methodology Comparing the Unit
          Value of Tosçelik's Sale to the Average Unit Value of
          Other Turkish Exporters</u>**

Commerce calculated the average unit value ("AUV") per

metric ton ("MT") for all U.S. imports of welded steel pipe and

tube from Turkey during the POR, and found that the unit value

of Tosçelik's sale is about [ ] the AUV of all imports from

Turkey.[2]  Commerce did not primarily rely on a comparison between

the AUV of all imports from Turkey and the unit value of

Tosçelik's sale.  Instead, Commerce obtained data from U.S.

Customs and Border Protection ("Customs") that listed the AUV of

---

[2] In the chart provided by Commerce, Tosçelik's unit value is [ ] per MT.  CRM Attach. 1 (Confidential).  Commerce reached this value by dividing the "entered value" of Tosçelik's single U.S. sale [ ] by the "theoretical quantity" of the shipment [ ]. Whereas the chart lists the [ ] per MT figure, the analysis in the CRM refers to the AUV of Tosçelik's sale as [ ] per MT.  The [ ] per MT figure is reached by dividing the "total value" of the sale [ ] by the "actual quantity" [ ].  Presumably, this includes the transportation costs associated with the sale.  It is unclear why Commerce includes the [ ] figure in the chart, but discusses the [ ] figure in its analysis.  The Court's determination that Tosçelik's sale is [ ] than the AUV of all Turkish imports is based on the [ ] figure.  The discrepancy rises to [ ] when the [ ] figure is used.  The precise calculation does not affect the disposition of this case at this stage in the proceedings, but may be highly relevant on remand.

each Turkish exporter during the POR.  The unit value of

Tosçelik's single sale fell within the range of the other

Turkish exporters' AUVs ([ ] per MT).  Commerce concluded that

because Tosçelik's sale is "comfortably within the range of

other commercial transactions . . . [there is] no reason to

suspect that [it] is not a bona fide commercial transaction."

CRM 4.

The "range" Commerce refers to is derived from a chart

attached to the CRM.  The chart is reproduced here:[3]

[ REDACTED ]

CRM Attach. 1 (Confidential).  Each row represents data from a

specific Turkish exporter.  The far left column lists the total

quantity of welded steel pipe and tube shipped from each

exporter.[4]  The next column lists the total value of the

shipments, followed by the AUV for each exporter.  Tosçelik's

shipment is represented by the company name "Tosyali Dis Ticaret

A.S.," which is Tosçelik's affiliated trading company.  The unit

value of Tosçelik's sale, [ ] per MT, does indeed fall within

the range of AUVs listed by exporter.

---

[3] The names of some exporters have been shortened for formatting
purposes.

[4] The chart encompasses steel pipe and tube classified under the
same Harmonized Tariff Schedule of the United States ("HTSUS")
classification as Tosçelik's U.S. shipment.

Allied Tube believes that the range of AUVs used by
Commerce in the above chart includes highly aberrational data.
Specifically, the range of data used by Commerce includes a
small quantity of sales [ ] imported at relatively high prices.[5]
Allied Tube argues that a single sale with a unit value in the [
] percentile is atypical of normal business practices and
commercially unreasonable.  If the top [ ] of sales by quantity
is excluded, the remaining [ ] of all imports by quantity fall
within an AUV range between [ ] per MT.  Tosçelik's sale, at [ ]
per MT, does not fall within this range.  Thus, Allied Tube
claims the price of Tosçelik's sale is commercially
unreasonable.

   **ii.** **Commerce's "Range" Methodology Including Allegedly**
   **Distortive Entries Does Not Reasonably Support Its**
   **Determination That Tosçelik's Sale Is Commercially**
   **Reasonable**

The Court must now determine whether Commerce's "range"
methodology, which includes the allegedly distortive entries, is
reasonable and supported by substantial evidence.  Commerce has
the discretion to choose whatever methodology it deems
appropriate, as long as it is reasonable and its conclusions are
supported by substantial evidence.  See Federal-Mogul Corp. v.

---

[5] The [ ] of imports by quantity that Allied Tube argues should
be excluded from Commerce's analysis are those imported by [ ].
Pl.'s Mot. J. Agency R. 12 n.7.  These exporters each have an
AUV of [ ] per MT or higher.

United States, 18 CIT 785, 807-08, 862 F. Supp. 384, 405 (1994);

see also Windmill, 26 CIT at 230, 193 F. Supp. 2d at 1312

("Given Commerce's discretion in employing a methodology to

exclude sales from the United States price that are

unrepresentative or distortive . . . the Court must determine

whether Commerce's actions in this case were reasonable.").

Allied Tube believes that Commerce acted contrary to its

own established practice "of using AUVs derived only after

excluding aberrant data for its analysis" to determine the

commercial reasonableness of U.S. sales in new shipper reviews.

Pl.'s Mot. J. Agency R. 13.  Commerce does frequently choose to

exclude aberrational data in its antidumping duty

determinations.  See, e.g., Hebei, 29 CIT at __, 374 F. Supp. 2d

at 1340 (approving Commerce's exclusion of "clearly

aberrational" data in a new shipper review); Luoyang Bearing

Corp. (Group) v. United States, 29 CIT __, __,  358 F. Supp. 2d

1296, 1299 (2005) (in determining a surrogate value for China,

Commerce excluded price data from countries with steel imports

of less than seven MTs); Shanghai Foreign Trade Enters. Co. v.

United States, 28 CIT __, __, 318 F. Supp. 2d 1339, 1350 (2004)

(explaining that when calculating surrogate values for non-

market economies, it is Commerce's practice to exclude

aberrational data); FAG U.K. Ltd. v. United States, 20 CIT 1277,

1282, 945 F. Supp. 260, 265 (1996) (permitting Commerce to exclude "certain sales which are clearly atypical" in an antidumping administrative review).  Commerce excludes aberrant data because a "[f]air (apples to apples) comparison is the goal of the price comparisons required by the antidumping laws . . . ."  Am. Permac, Inc. v. United States, 16 CIT 41, 42, 783 F. Supp. 1421, 1423 (1992).

While Commerce often excludes potentially aberrational data in its antidumping determinations, it is not always required to do so.  In Corus Staal BV v. United States, the plaintiff, a domestic party, challenged Commerce's decision to include sales of defective merchandise in its calculation of the U.S. price.  27 CIT 388, 404-05, 259 F. Supp. 2d 1253, 1267-68 (2003).  The plaintiff argued that because transactions involving defective merchandise are not in the "ordinary course of trade," they must be excluded from the analysis.  The Court disagreed, and stated that unlike the definition of normal value,[6] the definition of U.S. price contains no requirement that Commerce exclude sales that are arguably outside of the ordinary course of trade.  Id. at 406, 259 F. Supp. 2d at 1269.

---

[6] The definition of "normal value" is "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade . . . ."  19 U.S.C. § 1677b(a)(1)(B)(i) (2000) (emphasis added).

Corus Staal is easily distinguishable from the present case because the commercial reasonableness test for new shipper reviews necessarily implies that the analysis should only include prices "in the ordinary course of trade."  Commerce cannot reasonably conclude that the price of a new shipper's single sale is commercially reasonable if it is only similar to prices that are atypical of the industry.  In the present case, the "range" methodology can only be deemed reasonable if Commerce can explain why the allegedly distortive entries, some over [ ] the AUV for the industry, should be included in the range of reasonableness.  When Commerce's commercial reasonableness determination hinges on comparing the new shipper sale price to a range of values, it is crucial to make sure the values at both ends of that range are commercially reasonable.

Commerce has not only failed to explain why its "range" methodology is reasonable, but it even suggests that its own dataset might be overinclusive and therefore inaccurate. Commerce states:

> Given that the [HTSUS] numbers covered by the scope include more than subject merchandise, [and] that actual products included within any given shipment may be different from each other[,] [a] direct comparison between shipments should not be viewed as accurate price to price comparison.  Rather, such data are generally reflective of commercial transactions.

CRM 5 n.3.  In other words, the high-priced, small-quantity sales included in Commerce's analysis might be different types of merchandise than the standard pipe imported by Tosçelik even though they are encompassed in the same HTSUS classification. The potential inaccuracy of the dataset further undermines the reasonableness of Commerce's "range" methodology.

In previous investigations, Commerce stressed the importance of comparing the total AUV of all imports to the new shipper sale.  In Hebei, where Commerce determined that a new shipper sale was not bona fide, Commerce viewed the large price differential between the new shipper sale and the AUV of all the entries of the subject merchandise as significant.  See 29 CIT at __, 374 F. Supp. 2d at 1336.  Specifically, Commerce compared the Chinese manufacturer's U.S. sale price to:

    (1)   the weighted AUV of all Chinese entries of the subject merchandise during the POR that were covered by the antidumping duty order and not clearly aberrational based on proprietary data in the Customs database;

    (2)   the weighted AUV of all Chinese imports of the subject merchandise during the POR based on public import statistics; and

    (3)   the weighted AUV of U.S. imports of the subject merchandise from all countries during the POR based on publicly available U.S. import data.

See id. at __, 374 F. Supp. 2d at 1336; see also Tianjin, 29 CIT at __, 366 F. Supp. 2d at 1255 (stating that the prices listed

in four invoices from a single company "do not go as far as the AUV data in showing the typical price for Plaintiff's product"). By contrast, in this case, Commerce relied primarily on a comparison of Tosçelik's sale to small import quantities with comparatively high per-unit values.  Commerce has not persuaded the Court that this methodology is reasonable.  See Shanghai, 28 CIT at __, 318 F. Supp. 2d at 1351 ("A Commerce decision to rely on potentially aberrational data without explanation and contrary to its own practice is not based on substantial evidence and cannot be sustained.").

In summary, Commerce's "range" methodology is a shaky foundation on which to rest its conclusion that the price of Tosçelik's sale is commercially reasonable.  The methodology merely shows that the unit value of Tosçelik's sale is [ ] the AUVs of certain other Turkish exporters' aggregated entries under the same HTSUS classification.  Given that the unit value of Tosçelik's sale is [ ] the AUVs of the Turkish exporters that comprise [ ] of the total U.S. imports of welded carbon steel pipe and tube by quantity, Commerce has failed to demonstrate, by substantial evidence, that Tosçelik's price is commercially reasonable.  As such, this issue is remanded so that Commerce may attempt to explain why its methodology is reasonable, or to point to other grounds that support its ultimate conclusion that

Tosçelik's sale is commercially reasonable.  Cf. Luoyang Bearing Corp. (Group) v. United States, 28 CIT __, __, 347 F. Supp. 2d 1326, 1353 (2004) (remanding because Commerce failed to explain why it did not address the aberrational import data that the plaintiffs believed should be excluded).

### iii. Commerce's Analysis Excluding Allegedly Distortive Entries Does Not Demonstrate That Tosçelik's Sale Is Commercially Reasonable

In response to Allied Tube's concerns, Commerce explains in its final determination that even if the allegedly distortive data are excluded, Tosçelik's sale would still be considered commercially reasonable.  IDM 5-6.  To support this conclusion, Commerce states that a disaggregation of import data from major Turkish exporters indicates there are "a meaningful number of shipments with comparable unit values and quantities."  Id. 6.  Commerce does not point to any useful shipment-level data to demonstrate what it means by a "meaningful" number of shipments or "comparable" unit values and quantities.  Instead, Commerce asserts that "while the average value of each shipment of welded pipe and tube during the POR was [ ], the value of individual shipments ranged from [ ] to [ ]."  CRM 4.  Commerce claims that because the value of Tosçelik's single shipment fits within this range, it is commercially reasonable.  However, this analysis is problematic because Commerce only compares the value, but

ignores the quantity, of each individual shipment.  This range

of values is meaningless if the quantity of each shipment is

unknown.  Instead, Commerce could have disaggregated the import

data, calculated the shipment unit values, and then compared

them to the unit value of Tosçelik's shipment.  At present,

Commerce has not demonstrated by substantial evidence that when

the allegedly distortive entries are excluded from the analysis,

Tosçelik's sale is commercially reasonable.[7]

---

[7] Commerce also suggests that Allied Tube did not include all relevant figures in its analysis:

> [W]e found [Allied Tube's] analysis did not include the AUV for a certain Turkish manufacturer, which was within a reasonable range of Tosçelik's AUV and higher than the threshold AUV identified by petitioner. Moreover, the entry for the exporter reported by [Customs] was disregarded in petitioner's analysis altogether, despite the fact that the specific exporter's shipment was higher in volume than Tosçelik's U.S. sale.  Furthermore, the entered value of Tosçelik's U.S. sale is only slightly higher than the entered value of sales made by the specific exporter not named by the petitioner, as reported by [Customs].

IDM 5-6.  This explanation is difficult to comprehend because the Court is unable to identify the "certain Turkish manufacturer" that Allied Tube failed to include in its analysis.  Allied Tube appears to have accounted for all of the exporters listed in the chart accompanying the CRM.  See Pl.'s Mot. J. Agency R. 12 n.7.  Additionally, the Court is unable to find an entry that: (1) has an AUV that is higher than "the threshold AUV identified by petitioner" (i.e., [ ] per MT), (2) has a higher quantity than Tosçelik's sale, and (3) has an entered value that is only slightly lower than Tosçelik's sale.

(footnote continued)

### iv. Tosçelik's U.S. Sale, in Comparison to Its Home Market Prices, Does Not Demonstrate That the Sale Is Commercially Reasonable

At the suggestion of Allied Tube, Commerce compared Tosçelik's U.S. sale price to its home market prices.  Allied Tube alleges that the price of Tosçelik's single U.S. sale was [ ] than Tosçelik's average home market sales.[8]  If this were true, it would support the claim that Tosçelik was artificially inflating its U.S. price in order to obtain a favorable antidumping duty margin.  In response, Commerce states that it "used the prices included in [Tosçelik's home market database] and calculated an average [home market price] that is very comparable to the AUV of U.S. imports . . . ."[9]  IDM 5.  Notably, Commerce did not directly compare the price of Tosçelik's U.S. sale to its home market sales.   Instead Commerce found that Tosçelik's home market sales were comparable to the AUV for all U.S. imports.  As a result, the usefulness of

---

Therefore, this explanation is insufficient to support Commerce's finding that the price of Tosçelik's single U.S. sale is commercially reasonable.

[8] Allied Tube claims that Tosçelik's U.S. sale ([ ] per MT) was priced [ ] than that of the average of Tosçelik's home market sales.  Pl.'s Mot. J. Agency R. 11.  In fact, the U.S. sale is only [ ] than the average home market sale.

[9] The original language states "U.S. price" instead of "home market price."  The Court assumes this is a clerical error, because Commerce could not have used Tosçelik's home market price database in order to calculate an average U.S. price.

this analysis is entirely dependent on how Tosçelik's U.S. sale

compares to the AUV for all U.S. imports.  Because, as discussed

above, Commerce's analysis of the AUV of all U.S. imports does

not demonstrate that Tosçelik's sale was commercially

reasonable, Commerce's analysis of the home market sales

provides no independent support for its position.

   **C. Commerce's Determination That the Quantity of Tosçelik's
      U.S. Sale Is Commercially Reasonable Is Supported by
      Substantial Evidence**

     Allied Tube claims that there is not substantial evidence

to support Commerce's conclusion that the quantity of Tosçelik's

U.S. sale is commercially reasonable.  In its final

determination, Commerce found that:

> [The quantity of Tosçelik's U.S. sale] is not atypical
> of    Tosçelik's    normal    business    practices.
> Specifically, the majority of Tosçelik's home market
> sales  are  made  with  invoices  that  have  a  total
> quantity  that  is  less  than  the  sale  in  question.
> Therefore, we find the quantity of Tosçelik's one sale
> to  the  U.S.  is  comparable  to  the  size  of  Tosçelik's
> sales   in   its   home   market,   and   consistent   with
> Tosçelik's business practices in the home market.

IDM 5.  The fact that Tosçelik's single U.S. sale is of a larger

quantity than a majority of its home market sales is adequate to

support the conclusion that the quantity is commercially

reasonable.  Cf. Windmill, 26 CIT at 231, 193 F. Supp. 2d at

1313 ("[S]ingle sales, even those involving small quantities,

are not inherently commercially unreasonable and do not

necessarily involve selling practices atypical of the parties'

normal selling practices.").[10]

**D. Commerce's Determination That the Freight Charges Included in Tosçelik's U.S. Sale Price Are Commercially Reasonable Is Not Supported by Substantial Evidence**

Tosçelik shipped its U.S. sale by container with an

international freight charge of [ ] per MT.[11]  Allied Tube points

out that this freight charge is [ ] the average international

freight charge for U.S. imports from Turkey that fall under the

same HTSUS classification category as Tosçelik's entry.  Pl.'s

Reply Br. 11.  Commerce has considered extraordinarily high

---

[10] Allied Tube points out that the average quantity per shipment of welded carbon steel pipe and tube from Turkey during the POR was more than [ ] the quantity of Tosçelik's shipment. Pl.'s Mot. J. Agency R. 17-18.  However, Commerce has demonstrated that the quantity of the sale is in line with Tosçelik's selling practices in its home market.  The fact that Tosçelik's sale is smaller than the industry average does not render it commercially unreasonable if the quantity is typical of Tosçelik's normal business practices.

[11] Initially, Allied Tube claimed that the international freight cost of Tosçelik's sale was [ ] per MT.  Pl.'s Mot. J. Agency R. 18.  Allied Tube believed that this figure excluded domestic shipping costs.  Defendant-Intervenor Tosçelik responded that this was a clear misstatement of fact, because the [ ] per MT figure does in fact include domestic inland freight.  Def.-Int.'s Resp. Br. 32-33.  In its Reply Brief, Allied Tube explained that it believed [ ] per MT constituted only the international freight cost Tosçelik reported in its questionnaire response that "international freight" was [ ] per MT.  Pl.'s Reply Br. 10-11.  Allied Tube corrected its initial error, and states that the actual international freight charge (excluding domestic inland freight) is [ ] per MT.  Id. 11.

freight costs to be evidence that a sale is not bona fide.  See Windmill, 26 CIT at 231, 193 F. Supp. 2d at 1313.

To support its finding that Tosçelik's freight cost is not unreasonably high, Commerce states that it "verified Tosçelik's reported freight expenses and found the container shipment to be consistent with Tosçelik's typical business practices."  IDM 6. Commerce cites to a Sales Verification Exhibit that shows how much Tosçelik paid for the freight cost.  See id. n.14. Commerce has not adequately explained how this information supports the conclusion that Tosçelik's freight charge in this case was consistent with its typical business practices.

Commerce also suggests that Tosçelik's freight expenses are so high because "Tosçelik's U.S. sale was shipped by container rather than full vessel load and included inland freight expenses from the port of Mersin, Turkey."  Id. 6.  The fact that the shipment was made by container is irrelevant because Commerce did not demonstrate that it is commercially reasonable to use this method of shipment.  Additionally, the [ ] figure does not include domestic inland freight in Turkey.  Pl.'s Reply Br. 11.  Even without the additional cost of domestic inland freight, the international freight cost of Tosçelik's sale is [ ] the industry average.

Commerce claims that although Tosçelik's freight charges may be higher than average, this fact alone does not render the sale commercially unreasonable.  In American Silicon Technologies v. United States, the Court held that a high shipping price or unusual mode of shipment does not alone render a sale commercially unreasonable.  24 CIT 612, 617-18, 110 F. Supp. 2d 992, 997 (2000).  In that investigation, Commerce had found that although the shipping costs were high, the timing and mode of shipment did not indicate the sale was commercially unreasonable because the merchandise entered the United States "fully six months" prior to the POR and the exporter did not request a new shipper review.  Silicon Metal from Brazil, 64 Fed. Reg. 6305, 6317 (Dep't Commerce Feb. 9, 1999) (final results of new shipper review).  The Court sanctioned that approach.  Am. Silicon Techs., 24 CIT at 618, 110 F. Supp. 2d at 997.  By contrast, Tosçelik's single shipment entered the United States on April 28, 2005, only two days before the end of the POR.  Additionally, Tosçelik requested the new shipper review. This record evidence seems to undercut Commerce's claim that "there was no evidence that the freight charge was incurred for any reason related to the new shipper review."  Def.'s Resp. 17. Both the timing of the sale and Tosçelik's request for the new shipper review indicate otherwise.

In summary, there is ample record evidence that Tosçelik's freight charges are too high to be commercially reasonable. Commerce has failed to present any contradictory evidence that amounts to more than unsupported assertions. As a result, Commerce's finding that Tosçelik's freight charge does not indicate that the sale is commercially unreasonable is not supported by substantial evidence.

**E. Commerce's Ultimate Determination That Tosçelik's Single U.S. Sale Is Bona Fide Is Not Supported by Substantial Evidence**

The Court must aggregate Commerce's findings to ultimately determine whether there is substantial evidence to support its decision that under the totality of the circumstances, Tosçelik's single U.S. sale is bona fide. See Tianjin, 29 CIT at __, 366 F. Supp. 2d at 1249-50. As discussed above, Commerce has failed to show that substantial evidence supports its findings that the price and freight cost of Tosçelik's sale are commercially reasonable. On the other hand, there is substantial evidence to support Commerce's finding that the quantity of Tosçelik's sale is commercially reasonable. The only remaining factor Commerce considered is Tosçelik's "sales process." CRM 5. Commerce reviewed Tosçelik's home market and export selling practices, and found that the U.S. sale "followed the same sales process as their other export sales." CRM 5.

Allied Tube does not dispute this finding.  The fact that Tosçelik appears to have followed its normal business practices in executing its single U.S. sale is evidence that the sale is bona fide.  Cf. Windmill, 26 CIT at 231, 193 F. Supp. 2d at 1313 (holding that purchaser's failure to follow normal business practices is evidence that sale is not bona fide).  However, "the price factor has significant weight, and cannot necessarily be offset by a recitation of other factors by which the sale could be considered typical . . . ."  Tianjin, 29 CIT at __, 366 F. Supp. 2d at 1263.  Accordingly, under the totality of the circumstances, the Court does not find substantial evidence to support Commerce's finding that Tosçelik's U.S. sale is bona fide.

## III. CONCLUSIONS

For the foregoing reasons, the Court remands Commerce's final new shipper review determination.  Specifically, Commerce must explain, if it is able, why its "range" methodology (ranking the AUVs of the aggregate imports, within the same HTSUS classification, of each Turkish exporter) is a reasonable approach to determining whether the price of Tosçelik's U.S. sale is commercially reasonable.  In the course of this explanation, Commerce must address why the seemingly distortive entries identified by Allied Tube should not be excluded from

the analysis concerning the price of Tosçelik's U.S. sale.  If

Commerce is unable to provide such an explanation, it must

either (1) point to other record evidence that shows whether

Tosçelik's sale is a bona fide transaction under the totality of

the circumstances, or (2) conduct further investigations to

determine the same.  A separate order will be issued

accordingly.

                                    _/s/ Richard W. Goldberg
                                    **Richard W. Goldberg**
                                    **Senior Judge**


**Date:      July 9, 2007**
            **New York, New York**

ALLIED TUBE & CONDUIT CORP.,
IPSCO TUBULARS INC., AND
WHEATLAND TUBE COMPANY,

Before: Richard W. Goldberg,
Senior Judge

           Plaintiffs,

           v.

Court No. 06-00285

UNITED STATES,

**PUBLIC VERSION**

           Defendant,

           and

TOSÇELIK PROFIL VE SAC ENDUSTRISI
A.S.,

           Defendant-
           Intervenor.

**ORDER**

    Upon consideration of Plaintiffs' motion for judgment upon the agency record and briefs in support thereof, Defendant's and Defendant-Intervenor's briefs in opposition thereto, upon all other papers and proceedings had herein, and upon due deliberation, it is hereby

    **ORDERED** that Commerce's final antidumping duty new shipper review determination in <u>Certain Welded Carbon Steel Pipe and Tube from Turkey</u>, 71 Fed. Reg. 43444 (Aug. 1, 2006) is remanded; and it is further

    **ORDERED** that Commerce explain, if it is able, why its "range" methodology (ranking the AUVs of the aggregate imports, within the same HTSUS classification, of each Turkish exporter) is a reasonable approach to determine whether the price of Tosçelik's U.S. sale is commercially reasonable; and it is further

    **ORDERED** that Commerce address in the course of that explanation why the seemingly distortive entries identified by Allied Tube should not be excluded from the analysis concerning the price of Tosçelik's U.S. sale; and it is further

**ORDERED** that Commerce shall, if it is unable to provide such an explanation, point to other record evidence or conduct further investigations to determine whether the price of Tosçelik's single U.S. sale is commercially reasonable; and it is further

**ORDERED** that Commerce shall explain why, in the course of comparing the AUV of Tosçelik's single U.S. sale to other AUV data, it refers to a different value in its data chart [ ] than in the text of its Commercial Reasonableness Memorandum [ ], and it is further

**ORDERED** that Commerce shall, if it is able, point to record evidence, or, if other record evidence is unavailable, conduct further investigations to adequately explain why the freight charge associated with Tosçelik's sale is typical of Tosçelik's business practices, or otherwise commercially reasonable; and it is further

**ORDERED** that if Commerce is unable to conclude that Tosçelik's sale is a bona fide transaction, the new shipper review shall be rescinded; and it is further

**ORDERED** that Commerce shall, within sixty (60) days of the date of this Order, issue a remand determination in accordance with the instructions provided herein; and it is further

**ORDERED** that the parties may, within twenty (20) days of the date on which Commerce issues its remand determination, submit briefs addressing Commerce's remand determination, not to exceed twenty (20) pages in length; and it is further

**ORDERED** that the parties may, within fifteen (15) days of the date on which briefs addressing Commerce's remand determination are filed, submit response briefs, not to exceed fifteen (15) pages in length.

**SO ORDERED.**

**_/s/ Richard W. Goldberg___**
**Richard W. Goldberg**
**Senior Judge**

**Date:      July 9, 2007**
**           New York, New York**